UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas YORK, Defendant–Appellant.

No. 89–3013.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1990.

Decided June 3, 1991.

Ronald S. Safer, Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Terence P. Gillespie, Geena D. Cohen, Genson, Steinback & Gillespie, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Tom York never made a dime from his investment in the Just Friends Lounge. Not even when he tried to collect the insurance money. Two explosions rocked the bar during the night of April 18, 1981, ripping the building apart and burying York's partner, Gail Maher, who lived in an apartment above the bar, in the charred remains. There was a $60,000 insurance policy on the bar and a $50,000 policy on Maher's life; York was the beneficiary of both. Suspecting foul play, Maher's family contested York's claim to the insurance proceeds. The federal government shared the family's suspicions; it indicted York for attempting to defraud the insurance company by means of arson and murder. The jury convicted.

York bought the bar in June 1979, and leased it to Maher. She ran things, but not well. Just Friends was in the red from the day it opened, and Maher had to borrow over $30,000 from York to stay afloat. In addition, York, who was handy with tools, took care of the maintenance work himself. Still, Maher couldn't keep up with her bills. She never paid any money back to York, and by April 18, 1981, she was behind on every debt the bar had incurred. By August 1980, York was over $80,000 in debt and had had enough. He tried to list the business for sale, but the agency required Maher's signature on the listing agreement and she refused. York didn't know that back in June Maher had neglected to exercise a five-year option on the Lounge's real estate lease; without the long-term lease, the business had little resale value.

York contacted the Allstate Insurance Company to obtain life insurance policies for himself and Maher in October 1980. He told the insurance agent that he was calling on the advice of his lawyer and his accountant, but neither had ever advised York to obtain insurance on his own or Maher's life. York requested a double-indemnity provision in his own policy (dou-

bling the payout in the event of death by nonnatural causes); the insurance agent assumed that York wanted Maher's policy to be identical and included the double-indemnity provision in her application as well. Maher was overweight, however, and Allstate declined to insure her until a minor medical condition had cleared up. When Allstate approved a second application in February 1981 it refused to issue a term policy with the double-indemnity provision. Allstate agreed only to issue a whole life policy that carried a significantly higher premium. York paid it anyway. At about the same time, York made himself the co-beneficiary, along with Maher, of an existing policy on the bar's assets.

By this time, York and Maher were plotting to torch the bar to collect the insurance proceeds. Maher told a friend, Carol Mroch, who worked as a waitress at the lounge, about the plan that would put Mroch out of a job. Not to worry, though, Maher reassured Mroch; she and York would give Mroch $1,000 severance pay if the plan came to fruition. Maher also confided in another friend, John Etscheid. She told him that she and York planned to blow up the lounge by means of a natural gas explosion. They were going to have a dry run of the plan, she said, in April.

Maher spent the day of April 18 cleaning the Lounge. Although the bar was normally open seven days a week, it was shuttered on that Saturday night. York was seen at the bar in the afternoon. He parked his station wagon in the lot and made several trips into the lounge, carrying boxes with him. At Maher's request, her daughter Tammy spent the night at the home of Kim Bunting, Maher's sister. Tammy took but one change of clothes with her and left a treasured pet bird at home. According to Bunting, Maher told her that she didn't want Tammy in the lounge Saturday at all.

The Just Friends Lounge blew up that night. There were two explosions, both caused by homemade devices. One was a pipe bomb made from a length of steel pipe about ten inches long, capped at both ends. The pipe was filled with explosives and an initiating mechanism, attached to a household timer, was inserted through a small hole drilled in the side. The second device caused a natural gas explosion. The plug on the gas line leading into the basement of the Lounge had been removed, allowing gas to fill the room. A Kentucky Fried Chicken container filled with a flammable liquid was placed on a table and was ignited by means of a household timer and an electrical transformer. When the liquid ignited, so did the gas.

The explosions and fire made it difficult to determine whether Maher had been killed by the blast; the experts disagreed about whether she had been beaten to death first. York was at home later that night when Maher's father, Richard Schottenloher, called him with the news of the explosion. When York arrived at the Lounge, Schottenloher saw that he was wearing an elastic bandage around one hand. York said nothing, other than to complain of a headache. He did not inquire about Gail Maher's whereabouts or condition.

York did not attend the funeral. When Kim Bunting called York to ask why the family had not received any word or gesture of condolence from him, York offered an excuse—a family trip to Mexico that had been arranged several months before, he said, prevented him from attending the funeral—and then began to quiz Bunting about the police investigation and the condition of Maher's body when it was found. How badly was her face burned? Had her right arm disintegrated as he had heard? Had she been very close to the explosion? Who had identified the body? Did Bunting know about Maher's debts to people associated with the Mafia? Nonplussed, Bunting told York that all she cared about was finding Gail's killer; there was an icy silence on the line when she asked York if he shared her concern. This conversation fueled Bunting's suspicions of York; shortly afterward, she wrote to Allstate on behalf of her niece Tammy, contesting York's claim to Maher's insurance proceeds.

No one had contested York's claim to the insurance proceeds York collected three

years before, after his first wife, Maureen Jurkiewicz, was murdered. York was the beneficiary of Jurkiewicz's life insurance policy when she was killed. That policy was with the Allstate Insurance Company, for $50,000, and included a double-indemnity clause. Police found the body of York's wife decomposing in a small creek some two weeks after she disappeared in May 1978. Jurkiewicz had disappeared one day after she wrote the following note to York:

> Tom, I'm past talking. Couldn't get in touch with the lawyer today, but will Monday if I have to sit on the phone one hour on hold. I don't care if the phones at work are ringing off the hook. I asked Laurie Gentile to drive Ann to the tutor Saturday after I was accused of trying to bribe you to take you own daughter to a tutor so she'll pass. Laurie will drive her. It's taken care. It's not your concern anymore. You have endured great injustices all these years. Now it's over. Don't wash any clothes. Don't cook any food. Don't go for groceries. Don't do anything. Just get out of my life completely.

She had been shot once through the left temple. York owned a gun, but the bullet that killed his wife had fragmented and could not be traced to a particular weapon. No other evidence was found when the body was recovered.

York was apparently the last person to see his wife alive. Deanne Gentile, Jurkiewicz's cousin, spoke with her by phone for about twenty minutes just before midnight on the night of May 6, 1978. According to Gentile, Jurkiewicz's tone changed abruptly near the end of their conversation. When she called Jurkiewicz back twenty minutes later, York answered. Gentile asked for Jurkiewicz; York told her that her "goddamn cousin" had probably gone out to get a newspaper. Gentile knew from the earlier conversation, however, that Jurkiewicz had purchased a paper earlier in the evening.

York told the same story to the police the next day when he reported his wife missing. His wife, he told police, must have left the house before 11:00 p.m. because that was when the store closed. York told a different story to his wife's employer, however. His wife was late to work, he said, because she had taken their children to church. He told yet another story to his daughter. Her mother, he said, had been taken hostage at work by robbers who had taken her money and jewelry and then shot her.

York told the police nothing else, and instructed his children not to talk to the police or family members about their mother's disappearance. Shortly after his wife's body was found, York took his children to Disney World.

York was never charged with killing his wife. In May 1986, however, a federal grand jury indicted York, charging that he had used the mails in an attempt to defraud the insurance company by blowing up the Just Friends Lounge and killing Maher, and that he had committed arson. At a hearing before the trial, York's son Tommie invoked his fifth amendment privilege against self-incrimination and refused to answer substantive questions about the events surrounding Maher's death. After the hearing, while the parties were still in the courtroom, York screamed at his son, saying "You're going to put me in jail. You're going to let these people put me in jail, goddamn it." On the way home, York threatened his son, telling him that he would kill him if he didn't testify that statements Tommie had made earlier to government agents were false. When they next returned to court, Tommie told his probation officer what had happened and asked to be taken into protective custody.

During the trial, York tried to influence his daughter's testimony as well. He told his daughter Ann that she would have to testify that he was home on the night of Maher's death. Ann replied that she didn't remember whether or not her father was home that night, angering York. Later, he tried again:

> York: Ann, I'll have to ask you to say that you remember me home that night.
>
> Ann: But, Dad, I don't remember.

York: Goddamn it, don't you fucking realize that we could lose this house, and I could go to jail?

Ann: But, Dad, that's lying. Isn't that perjury?

York: Don't sit there with that smile on your face. I hope your kids do to you what you've done to me.

Both of York's children also testified that York had around the house all of the materials necessary to construct the bombs found in the ruins of the Just Friends Lounge. Ann York also testified about the events surrounding her mother's disappearance. She remembered only a few details: waking up in the middle of the night and hearing doors open and shut repeatedly; the replacement shortly after her mother's disappearance of an old couch that had been used in the basement.

The jury convicted York in February 1987, and the district court sentenced him to thirty years in prison. We reversed the conviction, however, and remanded the case for a new trial because hearsay evidence had been improperly admitted against York. *United States v. York*, 852 F.2d 221 (7th Cir.1988).

While York was in prison awaiting retrial, another inmate, Carl Beaman, reported to the FBI that York had told him that he had killed a woman and blown up a bar to collect insurance money. York, said Beaman, also told him that he had killed his first wife, shooting her in the back of the head. York had made these statements to Beaman several months before Beaman reported them; Beaman testified that he didn't believe them until another inmate read to him a newspaper article about York's case that, Beaman said, confirmed what York had told him.

York's second trial took place during the summer of 1989. Before trial the government obtained a superseding indictment that added a charge of obstruction of justice, based on the threats York made to his son before the first trial, to the charges contained in the original indictment. The jury again convicted York on all counts, and the judge sentenced York to forty years in prison, the obstruction charge accounting for the ten-year increase from York's first sentence. York filed this appeal, alleging seven grounds for reversal. He first maintains that evidence relating to other crimes, particularly his first wife's murder, was improperly admitted; second, that admitting Carl Beaman's testimony violated his sixth amendment right to counsel; third, that Gail Maher's statements to Carol Mroch and John Etscheid should have been excluded as hearsay and that their admission violated the confrontation clause of the sixth amendment; fourth, that the government was trying to unlawfully punish him for his successful appeal of his first conviction by adding the obstruction of justice count to the indictment before the second trial; fifth, that the government's voir dire of a defense witness was improper; sixth, that the entire jury venire was tainted and should have been dismissed; and last, that the district court's jury instructions on mail fraud were erroneous.

## I. Other Crimes Evidence

### A. The Jurkiewicz Murder

York contests the admission of evidence relating to his first wife's murder on the grounds that the evidence was irrelevant and unduly prejudicial. We note at the outset that we review decisions to admit evidence only to determine whether by admitting the evidence the district court abused its discretion; we traditionally accord "special deference to the evidentiary rulings of the trial court." *United States v. Shukitis*, 877 F.2d 1322, 1327 (7th Cir. 1989); *United States v. Briscoe*, 896 F.2d 1476, 1489–90 (7th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). The issue before us is not whether we would have admitted the challenged evidence, but whether the district court offered a principled basis for its decision. *United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir.1987).

The district court admitted evidence of the Jurkiewicz murder under Rule 404(b), which provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character

of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) proscribes the admission of acts of the defendant only when they have no relevance other than to show that a defendant had a criminal predisposition to commit the crime charged. York asserts that the evidence of his wife's murder should not have been admitted because the government offered it solely to convince the jury that he killed her, and so likely killed Gail Maher as well. The government maintains that the evidence was admissible under rule 404(b) because it showed that York intended to defraud the insurance company by killing Maher; York, the government contends, had pulled off the same scheme three years earlier when he killed his wife and collected the proceeds of her insurance policy. York counters that there was no evidence to suggest that he purchased an insurance policy for his wife intending to do her in; the evidence was irrelevant, he submits, because the government's theory was that he killed her after she told him she was divorcing him. York also points out that he and Jurkiewicz had purchased reciprocal policies when they were first married, several years before the murder, disproving the government's hypothesis that he had purchased that policy with an ulterior motive. The government parries by asserting that even if York didn't have murder in mind when he and Jurkiewicz originally bought their policies, the Jurkiewicz murder shows that York discovered that he could successfully "kill someone, conceal that crime and collect the insurance money." Brief at 23 n. 10. That fact, says the government, is relevant to show that York intended the same result three years later when he again collected the proceeds of a murder victim's insurance policy.

We agree—with both parties. There is little doubt that the Jurkiewicz murder evidence helped convince the jury of both propositions: that York was someone predisposed to commit murder *and* that he was planning all along to kill Maher and collect on her insurance policy when he and Maher purchased reciprocal policies because having successfully collected on his wife's policy after killing her three years earlier, he was planning to do the same to Maher. The government's assertion that the Jurkiewicz murder evidence has nothing to do with character or propensity overstates its case. "Almost *any* bad act evidence simultaneously condemns by besmirching character and by showing one or more of 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident', not to mention the 'other purposes' of which this list is meant to be illustrative." *Beasley,* 809 F.2d at 1279. Whatever its legitimate probative value, when considering extrinsic act evidence the jury is also susceptible to the inference that, simply because the defendant committed other crimes or disreputable acts, he is *by nature* more likely to have committed the crime charged. And the strength of this forbidden inference is at least roughly correlated to the infamy of the extrinsic act; if York was so evil as to murder his wife, the jury could have reasoned, he wouldn't have thought twice about doing in a business associate.

The jury could also have drawn legitimate inferences from the evidence. Simply put, the Jurkiewicz evidence was relevant to show that York intended to defraud the insurance company when he purchased and collected on Maher's policy. Mail fraud is a specific intent crime, *United States v. Draiman,* 784 F.2d 248, 254 (7th Cir.1986), and to convict York on that charge the government had to prove that York intended to collect the proceeds of Maher's policy by means of a material misrepresentation or omission—in this case, by neglecting to inform the company that he had planned and carried out Maher's murder. *See, e.g., Metropolitan Life Ins. Co. v. Estate of Cammon,* 929 F.2d 1220, 1221 (7th Cir.1991) ("Just as an insurer is entitled to know about diseases that affect the life expectancy of the insured, so it is entitled to know about other, more immediate risks, such as impending homicide."). That

York had, three years earlier, successfully defrauded an insurance company by collecting the proceeds of a policy held by his victim is compelling evidence that York intended the same result when he purchased an almost identical policy on Maher's life and made himself the beneficiary. Dean Wigmore's "doctrine of chances" tells us that highly unusual events are highly unlikely to repeat themselves; "the recurrence of a similar result ... tends to establish ... the presence of the normal, i.e. criminal, intent accompanying such an act...." 2 J. WIGMORE, EVIDENCE § 302 at 241 (Chadbourn rev.1979). The man who wins the lottery once is envied; the one who wins it twice is investigated. It is not every day that one's wife is murdered; it is more uncommon still that the murder occurs after the wife says she wants a divorce; and more unusual still that the jilted husband collects on a life insurance policy with a double-indemnity provision. That the same individual should later collect on exactly the same sort of policy after the grisly death of a business partner who owed him money raises eyebrows; the odds of the same individual reaping the benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance. *See United States v. Woods*, 484 F.2d 127 (4th Cir.1973), *cert. denied*, 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974) (evidence that nine other children had suffered episodes of cyanosis while in custody of defendant held admissible to prove that defendant killed tenth child "because of the remoteness of the possibility that so many infants in the care and custody of defendant would suffer cyanotic episodes and respiratory difficulties if they were not induced by the defendant's wrongdoing"). This inference is purely objective, and has nothing to do with a subjective assessment of York's character.

The fact that York's defense included innocent explanations for having insurance on Maher's life and for some of his activities after Maher's death underscores the relevance of the Jurkiewicz murder evidence to York's intent during the Maher episode. When the defendant affirmatively denies having the requisite intent by proffering an innocent explanation for his actions, the government is entitled to rebut that argument. "Evidence of another crime which tends to undermine defendant's innocent explanations for his act will be admitted." J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE, § 404[12], at 404–84 (1990); *see, e.g., United States v. Leight*, 818 F.2d 1297, 1303 (7th Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); *United States v. Tuchow*, 768 F.2d 855, 862 (7th Cir.1985); *United States v. Chaimson*, 760 F.2d 798, 806 (7th Cir.1985).

Courts routinely admit evidence of prior insurance frauds to prove a present intent to defraud an insurance company. *See, e.g., United States v. Draiman*, 784 F.2d 248, 254 (7th Cir.1986); *United States v. Basile*, 771 F.2d 307, 311 (7th Cir.1985); *United States v. Wormick*, 709 F.2d 454, 459 (7th Cir.1983); *United States v. Marroquin*, 885 F.2d 1240, 1247 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1807, 108 L.Ed.2d 938 (1990); *United States v. Campbell*, 845 F.2d 1374, 1381 (6th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988); *United States v. Gordon*, 780 F.2d 1165, 1173–74 (5th Cir. 1986); *United States v. Jackson*, 761 F.2d 1541, 1543 (11th Cir.1985); *United States v. Fitterer*, 710 F.2d 1328, 1332 (8th Cir.), *cert. denied*, 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983). That York's schemes involved murder does nothing to diminish the probative force of the inference. We have, on a number of occasions, upheld the admission of evidence of prior murders, or attempts, when they were probative of an issue other than criminal disposition. *See, e.g., Lee v. Flannigan*, 884 F.2d 945, 953 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3277, 111 L.E.2d 786 (1990); *Leight*, 818 F.2d at 1304; *United States v. Fountain*, 768 F.2d 790, 796 (7th Cir.1985), *cert. denied*, 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986); *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599,

83 L.Ed.2d 708 (1984). And although we have not previously been confronted with a case combining the elements of murder and insurance fraud, the Eighth Circuit has, and has upheld the admission of the extrinsic murder evidence each time. *See United States v. Engleman,* 648 F.2d 473, 478–79 (8th Cir.1981); *United States v. Calvert,* 523 F.2d 895, 908 (8th Cir.1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976).

York objects that the Jurkiewicz murder evidence is not similar enough to the events surrounding Maher's murder to be relevant to show intent, but he is looking at trees rather than the forest. Both crimes were attempts to defraud an insurance company by murdering women who had named York as the beneficiary of their life insurance policies. This is similarity enough to make the Jurkiewicz evidence probative of intent. As we have noted in the past, when evidence is offered to prove intent, " 'the degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent.' ... The prior acts need not be duplicates of the one for which the defendant is now being tried." *United States v. Radseck,* 718 F.2d 233, 237 (7th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (quoting *United States v. O'Brien,* 618 F.2d 1234, 1238 (7th Cir.), *cert. denied,* 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980)).

We need not rely solely on the most obvious similarities between the crimes. When viewed in the context of a mail fraud scheme, the specific characteristics of the two crimes clearly reinforce the government's premise that York orchestrated both plans. In both cases, York purchased a $50,000 life insurance policy on the victim. The policy on his wife included a double-indemnity provision that doubled the payout in the event that the insured's death was due to nonnatural causes. The original application for Maher's policy contained a similar provision, but the company refused to provide double-indemnity coverage for Maher because she was significantly overweight. York collected on each policy at a time when he faced some prospect of financial harm, in the first case, divorce, and in the second, the failure of the Just Friends Lounge. Maher was, in all likelihood, killed in the bar, which doubled as her home; the jury could have reasonably inferred that York killed Jurkiewicz in their home as well. In both cases, too, physical evidence relating to the murders was obliterated: Jurkiewicz had been dumped into a creek after she was killed, and the explosions and fire that destroyed the lounge made it impossible to determine precisely how Maher died. After the deaths of Jurkiewicz and Maher, York let his own insurance lapse. After both deaths, York, a former police officer, instructed his children not to talk with the police or anyone else about the incidents. Shortly after both murders, York took his family away, once to Florida and once to Mexico.

The similarities between Jurkiewicz's death and Maher's could, of course, be nothing more than a gruesome coincidence, but that isn't the point. We need not determine whether this evidence, standing alone, would have been sufficient to convict York; if the evidence increases the probability that York committed the crime, it is, by definition, relevant. *See* FED.R.EVID. 401 ("Relevant evidence" defined as "evidence having any tendency to make the existence of any fact ... more probable or less probable than it would be without the evidence"). The dual nature of extrinsic act evidence, standing alone, is not reason to exclude it. The evidence of Maureen Jurkiewicz's death makes it more likely that York killed Gail Maher; that is all that Rule 404(b) requires. Rule 404(b) excludes evidence only when it is not relevant to prove something other than the defendant's bad character; "[i]f offered for such a proper purpose, the evidence is subject only to general strictures limiting admissibility such as Rules 402 and 403." *Huddleston v. United States,* 485 U.S. 681, 688, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988).

Rule 402 excludes irrelevant evidence, and "similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Id.* at 689, 108 S.Ct.

at 1501; *see also United States v. Montoya*, 891 F.2d 1273, 1284 (7th Cir.1989). This does not mean, as York's brief suggests, that the government must prove, or that the trial court must find, that the defendant committed the other acts by a preponderance of the evidence. *Huddleston* is clear on this point:

> In determining whether the Government has introduced sufficient evidence ... the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence.

485 U.S. at 690, 108 S.Ct. at 1501. We determine only whether the jury could by a preponderance have reasonably determined that the other act occurred. This inquiry is no different than any sufficiency of the evidence challenge and the party challenging admissibility has the heavy burden of showing that no reasonable jury could have reached the same conclusion.

The government presented more than enough evidence to satisfy this "minimal" standard. *Id.* Carl Beaman testified that while awaiting retrial, York confessed to him that he had shot his wife in the head, and that testimony alone is sufficient to support a verdict that York killed his first wife. *See United States v. Ostrowsky*, 501 F.2d 318, 323 (7th Cir.1974) ("All that was needed to satisfy *the clear and convincing* standard was the admission by [defendant] to [the witness] that he had killed [the victim]." (emphasis added)). York's counsel offers a strong impeachment argument, but we cannot say that it would have been unreasonable for a jury to credit Beaman's testimony. The district judge found Beaman sufficiently credible to permit him to testify during the trial, and at sentencing specifically cited his testimony as a basis for her conclusion that York had murdered Maureen Jurkiewicz. We are in no position to quarrel with her assessment of Beaman's testimony.

Even had a jury disregarded Beaman's testimony altogether, it could have still concluded that York killed his first wife. On the day before her death, Jurkiewicz wrote York a note telling him to get out of her life. York was apparently the last person to see his wife alive, had access to a gun, and told a series of bizarre and inconsistent stories about his wife's disappearance to family members, police, and his wife's employer. York instructed his children not to talk to anyone, including the police, about their mother's death; he took them to Disney World in Florida soon after the murder was discovered. York disposed of and replaced a basement couch "immediately" after his wife disappeared. And, of course, York was the beneficiary of his wife's life insurance policy. Considering this evidence in its entirety, *Huddleston*, 485 U.S. at 690–91, 108 S.Ct. at 1501–02, a jury reasonably could have concluded that York killed his first wife and successfully concealed his guilt; admission of the evidence relating to her murder was therefore proper under rule 404(b).

■ York also challenges the evidence on the ground that it was unduly prejudicial. The text of Rule 403 makes plain that its application is limited to cases in which the probative value of the evidence is "substantially outweighed" by its improper effect. *See also* 22 C. Wright & K. Graham, Federal Practice and Procedure § 5221, at 309–10 (1978). Assessing the relative impact of the legitimate and illegitimate inferences supported by evidence is, at best, an imprecise task, one that, to a large extent, requires a contemporaneous assessment of the presentation, credibility, and impact of the challenged evidence. We therefore accord great deference to the district judge's decision to admit or exclude evidence under Rule 403.

York's argument under Rule 403 largely reiterates his view that the Jurkiewicz murder evidence had scant probative value, but we have already addressed that side of the admissibility equation. The evidence was highly relevant to York's intent. To successfully invoke Rule 403 at trial, York must demonstrate that the impact of the

illegitimate inference guaranteed by this evidence—once a murderer, always a murderer—was significantly stronger than that of the legitimate inference the evidence supports—that York believed he could successfully defraud Allstate by killing Maher because he had done it before when he killed Jurkiewicz. To invoke Rule 403 on appeal, York must also demonstrate that the district court's determination that the illegitimate impact did not substantially outweigh the legitimate impact was so unprincipled that the decision to admit the evidence amounted to an abuse of the discretion.

York cannot make that case. Judge Williams considered York's Rule 404(b) and Rule 403 objections to the Jurkiewicz evidence before trial and issued a careful and considered opinion explaining her reasons for admitting the evidence. She concluded that the evidence was highly probative and not unfairly prejudicial to the defendant. The judge noted that extrinsic crime evidence is not made unfairly prejudicial simply because it relates to a murder; the prejudice that inures from that fact is the natural by-product of the act and there is nothing *unfairly* prejudicial about putting that fact before the jury. Judge Williams correctly observed that the unfairness derives from attempts to exploit the "gruesome and unnecessary details" of a murder. *Ostrowsky*, 501 F.2d at 323.

York cites *Ostrowsky* to support his claim since in that case we excluded evidence of a prior murder on Rule 403 grounds. In *Ostrowsky*, however, we made clear that our holding was premised not on the fact that the prior crime was a murder, but on the nature of the proof and the presentation of the evidence relating to the murder. *Id.* Moreover, the court held only that *some* of the extraneous evidence of the murder should have been excluded as unnecessarily cumulative; some of the murder evidence, the court held, had been properly admitted. *Id.* York has not objected that the government's Jurkiewicz murder evidence was cumulative; that argument would have undermined his claim that there was insufficient evidence linking York to the murder to satisfy the standard of proof required by *Huddleston*.

The district court did not make the mistake of admitting extraneous details about the prior murder in this case. The court admitted only three facts, via testimony, relating to the details of the murder itself: (1) that the body was found floating in a creek; (2) that the body was completely nude except for a wristwatch that had stopped at 4:05; and (3) that Maureen Jurkiewicz had been shot in the head. The trial judge affirmatively excluded, on grounds of undue prejudice, evidence relating to the condition of the body when it was found and Tommie York's opinion that his father killed his mother (which was relevant to explain why he at one point recanted statements made earlier to the government). Moreover, the judge repeatedly issued limiting instructions for the evidence that related to Jurkiewicz's murder and to York's actions before and afterward. The court's strict control of the admission and presentation of the extrinsic evidence and vigilant efforts to minimize its prejudicial impact stand in dramatic contrast to the handling of extrinsic murder evidence cited by the defendant in *Ostrowsky*. When trial courts exercise this degree of care, we have not hesitated to admit extrinsic evidence, even when it relates to truly reprehensible crimes. As we observed in *United States v. Covelli*,

> unlike the situation in *Ostrowsky*, the court consistently allowed only necessary evidence to be introduced and ruled that "gory details" of the murder could not be admitted. No photographs of the victim or the crime scene were seen by the jury.... It is clear that the district court carefully balanced the evidence in terms of its probative value and prejudicial effect. On balance we are persuaded that the district court did not abuse its discretion in admitting this evidence.

738 F.2d 847, 855 (7th Cir.), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984).

We also note that this is not a case like *Ostrowsky* where the nature of the extrin-

sic evidence was qualitatively different than that of the acts charged in the indictment. It does not, therefore, pose the same degree of danger that the jury will reason that because the defendant committed a heinous crime on some other occasion, he wouldn't have thought twice about committing some lesser offense. Indeed, the evidence relating to Maureen Jurkiewicz's death paled in contrast to the evidence presented regarding the death of Gail Maher. The cause of Maher's death was contested (the defense theory being that she was killed by the explosion while committing an arson; the prosecution arguing that York killed Maher first and then blew up the lounge), and consequently both sides presented detailed evidence as to the injuries sustained by Maher, including photographs and X-rays taken during two autopsies of Maher's body. The unfair prejudice that could have inured against the defendant by the sanitized and tightly controlled presentation of evidence relating to Jurkiewicz was minimal in light of the grisly nature of the evidence presented relating to Maher's death.

York's claim that the Jurkiewicz evidence was unfairly prejudicial is based, in large measure, on the fact that much of it was derived from witnesses related to York, namely his children and relatives of Maureen Jurkiewicz. The testimony of these witnesses, York asserts, was extremely emotional and, therefore, highly prejudicial. He is, no doubt, correct. But we don't bar those close to a defendant from testifying against him on the ground that their damning testimony carries too much weight with the jury (even the spousal privileges rest on policy grounds—respecting the sanctity of marriage—rather than grounds of undue prejudice). Moreover, many of the witnesses about which York complains—his children, in particular—would have been called to testify about events surrounding the death of Gail Maher even had the court excluded all evidence of the Jurkiewicz murder. Much of the antagonism and emotion that attended their testimony would doubtless have still been present. Tommie York, for example, testified that his father had threatened to kill him after he invoked the fifth amendment at his father's first trial. He and his sister Ann both testified that York wanted their testimony at his first trial—in which evidence of their mother's death was not admitted—to exonerate him. York demanded that Ann testify that he had been home "that night," even though she told him that she did not remember if he was at home. This testimony, quoted at the outset of this opinion, was dramatic. Tommie York also testified that his father wanted him to say that he gave damaging information to the government only because he was mad at his father for throwing him out of the house. This testimony undoubtedly alerted the jury that York's relationship with his family was not all that it could be; their testimony concerning the events surrounding their mother's death probably solidified that conclusion, but it is one the jury would likely have drawn either way.

In sum, the evidence of the Jurkiewicz murder was relevant to York's intent, and Judge Williams did all that she could to focus the jury's consideration of the evidence on that issue. She concluded that, on balance, the evidence presented would not prompt the jury to disregard her instructions, and we agree. Her decision to admit the evidence was anything but an abuse of discretion.

## B. Tampering with the Utility Meter

■ York also contests the admission of evidence that he had tampered with the electric meter at his home. The government presented evidence that at least as far back as 1979 York had devised a means of preventing the electric meter at his home from recording electricity use. York accomplished this by drilling a small hole through the cover of the meter and inserting a piece of straw through the hole and into a hole in one of the meter gears. The Commonwealth Edison representative who discovered the tampering described York's technique as "a very unique way" of reducing his electric bill—"so simple yet so effective." The government argued that the evidence was probative of York's knowledge about electrical devices and tools, and

the judge admitted the evidence with an instruction directing the jury to consider it only for that purpose. York argues that the judge should have excluded this evidence because it proved no more than that York "knew how to use a drill."

Whether York knew how to use a drill, however, was relevant to whether he was capable of building the pipe bomb and detonating mechanism that destroyed the lounge. More importantly, the evidence demonstrated York's knowledge about the workings of a relatively complicated electrical device. York knew enough about the workings of his electric meter to devise a means of stopping the meter that escaped detection for several years, one so ingenious that the Commonwealth Edison representative who discovered it had never before seen a meter stopped in that manner.

To counterbalance the probative value of this evidence, York offers only a conclusory statement that the evidence was unfairly prejudicial, presumably because it related to illegal activity. As we have already noted, however, that fact alone does not make evidence unduly prejudicial. Moreover, it seems unlikely that the jury would draw from this evidence the forbidden inference that, because he was the sort who would tamper with his electric meter, he was also the sort who would murder a business associate to collect on her insurance. The effect of any unfair prejudice engendered by the admission of this evidence was minimal, and the judge did not abuse her discretion by admitting it.

II. Sixth Amendment Right to Counsel

■ At York's first trial, the government did not include evidence relating to his wife's death as part of its case. After Carl Beaman reported York's confessions to the FBI, however, the government concluded that it had enough evidence relating to York's involvement in that murder to introduce it. Beaman's testimony then became an important aspect of the government's case. York argues that the testimony should not have been admitted because Beaman elicited the incriminatory statements from him while acting as a government agent, violating his sixth amendment right to counsel.

In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court held that government agents had violated the sixth amendment right to counsel of the defendant by "us[ing] against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited against him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. at 1203. To find a sixth amendment violation, then, the statements in question must have been (1) "deliberately elicited" (2) by a government "agent." *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir.1986), *cert. denied*, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). The Supreme Court has twice addressed situations in which the government introduced statements made by defendants to "jailhouse informants" against the defendant at trial. In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), and FBI agent told a longstanding informant, whom it paid whenever he produced useful information and who was incarcerated with the defendant, "to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question" them about their crimes. Henry, the defendant, was one of a handful of federal prisoners incarcerated at the Norfolk County, Virginia, jail. Nichols, the government informant, ignored his instructions and struck up a friendship with Henry, who made incriminating statements to Nichols during the course of their conversations. The Court held that Nichols was a government agent and had, through his conversations with Henry, deliberately elicited the statements in violation of Henry's sixth amendment rights.

In *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the police intentionally placed the defendant in a cell with Lee, a prisoner who had agreed to act as an informant, in an attempt to discover the identities of the defendant's accomplices. They instructed the informant not to question Wilson about his crimes but simply to listen and report any

information that Wilson volunteered. Unlike the informant in *Henry*, Lee, for the most part, obeyed instructions. The opinion suggests that the only statement he made in response to any of Wilson's comments about the trial was that Wilson's story "didn't sound too good." Wilson ultimately confessed to Lee, and the government introduced those statements at his trial. The Court held that Lee—although a government agent—had acted only as a listening post and had done nothing to elicit the statements from Wilson.

Both *Henry* and *Kuhlmann* focused more directly on whether the challenged statements had been deliberately elicited rather than the question of whether the informants were acting as government agents when the statements were made. In both cases, the Court concluded without discussion that the informants were agents. It is not hard to see why: in each case the government officials identified specific prisoners from whom they wanted information and found informants to retrieve it. *See also Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 1250, 113 L.Ed.2d 302 (1991). Nichols was told to pay attention to the handful of federal prisoners in a county jail; Lee was told to pay attention to his cellmate. Recognizing this fact, we have in the past "refuse[d] to extend the rule of *Massiah* and *Henry* to situations where an individual, acting on his own initiative, deliberately elicits incriminating information." *United States v. Malik,* 680 F.2d 1162, 1165 (7th Cir.1982); *see also United States v. Metcalfe,* 698 F.2d 877, 882 (7th Cir.), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983). In *Malik,* the government jailed an informant wanted by British authorities for bank robbery. In hope of avoiding extradition, the informant turned over statements made by the defendants. There was no evidence that the government intended or knew that the jailed informant would continue to gather information, and the natural inference would have been otherwise; the informant had every reason not to continue working for the government after it had abandoned him. In *Metcalfe,* there was simply no evidence that the informant

had ever had any contact with the FBI before he turned over the defendant's statements to the authorities.

No one directed Carl Beaman to cozy up to Tom York. When Beaman arrived at the Terre Haute penitentiary in May 1987, York was already there. Beaman was serving a forty-year sentence for two bank robbery convictions and had been acting as a prison informant for the FBI since 1983. Beaman was transferred to Terre Haute from Talledega, Alabama, after testifying against an accomplice in the bank robbery for which he had been convicted. There is no evidence that Beaman was placed in Terre Haute to meet York or to obtain information from him; the Bureau of Alcohol, Tobacco, and Firearms ("ATF") had investigated York's crimes, not the FBI. The FBI learned of York only when Beaman came to them with York's confessions. John Stoll, the FBI agent to whom Beaman reported when he had information, did tell Beaman that he only wanted information about certain crimes—murder, official corruption, and drug offenses—but that direction hardly narrowed the field of opportunity for Beaman. Beaman's situation was thus in many respects the same as that of the informant in *United States v. Watson,* 894 F.2d 1345 (D.C.Cir.1990). Like Beaman, the informant in that case had been a government informant for some time when he came into contact with the defendant. Like Beaman, the informant had some expectation that he would benefit from providing information to the government agent with whom he maintained contact. The court held, however, that the informant was not a government agent, noting that there was no evidence that the government had directed or steered the informant toward the defendant. The informant was not so much a government agent, the court held, as he was an entrepreneur who hoped to sell information to the government. *Id.* at 1348.

Does this mean that the government can send an informant on a reconnaissance patrol through the prison population to gather evidence as long as it does not target specific individuals for the informant's at-

tentions? No. The government tried that tactic in *United States v. Sampol*, 636 F.2d 621, 638 (D.C.Cir.1980), to no avail. In that case the court held that where there is a prearrangement between the government and an informant, the informant is a government agent. *Id.* There is a distinct difference between passively receiving information provided by enterprising inmates and striking deals with inmates—whether based on coercion or enticement—to gather as much information as possible from other inmates, as did the trial court and the prosecution in *Sampol.* "An element of the agency relationship is the understanding of the parties that the principal is to be in control of the undertaking and that the agent shall serve ... subject to the directions of the principal." *Federal Pants, Inc. v. Stocking*, 762 F.2d 561, 564 (7th Cir.1985). Whether the principal exercises its control strictly, by targeting specific individuals, or casually, by loosing an informant on the prison population at large, is irrelevant. "It is the ability to control, whether exercised or unexercised, that indicates agency relationship." *American Broadcasting Cos. v. Climate Control Corp.*, 524 F.Supp. 1014, 1018 (N.D.Ill. 1981).

Undoubtedly, most inmates who provide information to law enforcement officials harbor the hope that their service will not go unrewarded. But as the court cautioned in *Lightbourne v. Dugger*, 829 F.2d 1012, 1021 (11th Cir.1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988), "[w]e must not confuse speculation about [an informant's] motives for assisting the police for evidence that the police promised [the informant] consideration for his help or, otherwise, bargained for his active assistance." One might argue that merely by providing the market for information, the government violates the right to counsel, but that would be to overstate the government's role in most cases; the instinct for self-preservation is as sharply honed, if not more so, in prison as it is elsewhere. From the moment that suspects are arrested, they learn (if it had not already occurred to them) that cooperation with the authorities may benefit them.

That inmates realize there is a market for information about crime does not make each inmate who enters the market a government agent. Moreover, we are reluctant to discourage prisoners from reporting information to appropriate authorities; they, like all citizens, should report such information. *See Lightbourne*, 829 F.2d at 1020. It is merely a tautology to argue that the government should not be in the business of providing a market for information that infringes sixth amendment rights; there is no infringement unless the informant was a government agent, and there is no agency absent the government's agreement to reward the informant for his services.

Agreements, of course, don't have to be explicit or formal, and are often inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct over a sustained period of time. What of symbiotic relationships between informants and government law enforcement officials that evolve from an initial exercise of initiative by the informant? Such cases present sticky questions, and York's is an example. York contends that there was an implicit agreement between Beaman and Agent Stoll since Beaman had worked for Stoll for a number of years and was reporting to Stoll on a weekly basis during the period when York was confiding to Beaman. Among the favors he performed for the FBI, Beaman made consensually monitored phone calls to persons he knew outside the prison who were dealing drugs, an activity he could not have pursued while in prison without government forbearance. Agent Stoll also testified that the government had an agreement with Beaman that it would inform his parole board of the extent of his cooperation when he became eligible for parole. Beaman, however, had never been paid for, or received any benefit from, the information he gave to the FBI before he related York's statements to Agent Stoll. In fact, Beaman maintained that the government had welched on the only promise it had ever made to him in connection with his cooperation. Accord-

ing to Beaman, an Assistant United States Attorney had promised, but failed, to write a letter to his parole board on his behalf in 1986 when Beaman testified in a trial as a government witness. The government also agreed to support Beaman's application for parole in exchange for his testimony against York at trial, but that promise bears only on Beaman's credibility as a government witness, not on his status as a government agent at the time he maintains York confided in him. Beaman did receive $5,000 and another promise that the prosecutors would support his application for parole *after* he related York's statements to Agent Stoll. Payment after providing information may, as York maintains, be probative of a prior agreement between the informant and the government (though the cases cited for this proposition in his brief do not stand for that proposition at all). Beaman testified, and the government corroborated his testimony, that the bulk of the money he received was to reimburse him for long distance phone calls and lost prison wages stemming from his past cooperation with the government. Agent Stoll testified that about a third of the money was a reward for information and testimony Beaman provided to the FBI in 1986. He maintained that the money had nothing to do with the information Beaman provided concerning York, as York's was an ATF, not an FBI, case. Agent Stoll did not, however, explain the curious timing of the payment.

After conducting a hearing on the *Massiah* issue, the district court concluded that Beaman was not a government agent when he spoke with York because, in the court's words, "he was under no general direction by any special agent during that period of time as to how to proceed." Tr. at 446. We agree with that view of the facts, but must respectfully disagree as to their legal significance. There is no question that the FBI was not closely managing Beaman's actions in prison; the relevant question, however, is whether the FBI told Beaman to collect information, not whether it told him exactly *how* or *when* to collect it, or from *whom*. We conclude that, as a matter of law, Beaman was acting on behalf of

the government while incarcerated at Terre Haute. Agent Stoll conceded that there was an informal agreement with Beaman to assist his parole application by detailing the extent of his cooperation with the government; that fact distinguishes Beaman from Young, the informant in *Watson, supra*. Beaman, unlike Young, had been promised a reward for suitable information obtained from any source; the structure of the deal also maximized Beaman's incentive to cooperate since the strength of the government's support would be a direct function of the assistance he provided. Moreover, Stoll told Beaman the type of information he was interested in receiving; that statement was tantamount to an invitation to Beaman to go out and look for that type of information.

The alternative explanation strikes us as implausible. Beaman's work for the government put him at risk in the midst of several prison populations, groups not well known for their hospitality toward government informants. Beaman knew this quite well; he had been transferred to different prisons several times for his own safety, and asked Agent Stoll not to interview him a second time at Terre Haute because he feared another meeting would raise suspicions that he was cooperating with the government. It seems unlikely that Beaman would have been willing to assume such risks over a prolonged period of time simply on the hope that the government would treat him charitably, particularly when, at least in Beaman's view, the government had failed to come through on an earlier concrete promise it had made to him. Unlike the informant in *United States v. Hicks*, 798 F.2d 446 (11th Cir. 1986), who was motivated to provide information about a defendant's drug trafficking by a personal crusade against drugs prompted by the experiences of family members who had been involved with drugs, Beaman was not motivated by any concern other than a desire to be paroled at the earliest possible opportunity. Beaman worked for the government because he had been assured that his good deeds would not go unrewarded.

Which brings us to the question of whether Beaman set about to elicit the incriminating statements from York. Beaman was assigned as a clerk in the recreation department at the prison. While serving in that position, he saw York on almost a daily basis. Beaman reported that he and York often conversed, and had about a dozen conversations that touched on York's crimes. Beaman testified as to the substance of two of these conversations, steadfastly maintaining that York initiated both. On one occasion, he and York "was kind of digging in each other's past" and Beaman told York that his son had been in trouble with the law. York related that his own son, Tommie, had also been in trouble. According to Beaman, York added that his son had testified against him during his first trial and feared him because he suspected York of killing his mother, Maureen Jurkiewicz. To this, Beaman responded: "You must have been pretty mad at the bitch." York replied: "Mad enough to put a bullet in the back of her head."

On a later date in the spring of 1988, York related that he was going to come into some money as the result of the reversal of his first conviction. Beaman testified that York told him that he was going to be able to collect insurance money on a building he had blown up and on a woman he had killed in the process. Beaman related that he then (apparently redundantly) asked York whether he was going to "make any money from it," to which York replied that he "wouldn't have done it if I didn't think it was worthwhile." York went on to tell Beaman that the bomb had been designed to collapse the building on top of the woman to disguise the fact that he had hit her in the head, but that it had gone off early—"in the woman's face."

Undoubtedly, Beaman's "conduct and apparent status as a person sharing a common plight," *Henry*, 447 U.S. at 274, 100 S.Ct. at 2189, influenced York's decision to make incriminating statements to him. That fact, however, does not rise to the level of "deliberate elicitation"; the same could be said of the government agent inserted into the defendant's cell as a "listening post" in *Kuhlmann*. In *Henry* the

Court focused on the fact that Nichols, the government informant, deliberately engaged the defendant in conversations about his crimes; there is no similar evidence respecting Beaman. Granted, Beaman conversed with York about the crimes after York brought the subjects up, but to have done anything else would have done little but raise suspicions about his status. We do not require inmates serving as government agents to reveal their status by removing themselves from situations in which they might discover incriminating information about their fellow inmates or abruptly changing the subject of conversation when inmates unburden themselves. In such cases, where they stumble upon the information "by luck or happenstance," *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. at 2630 (quoting *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985)), the information is not the product of government investigatory activity and there is no ground for maintaining that the government surreptitiously interrogated the defendant in the absence of counsel. Certainly, had Beaman sought to capitalize on his good fortune by quizzing York about the details of his crimes, he might be said to have deliberately elicited any subsequent revelations. But Beaman did not do so. So far as the record reveals, his only comment preceding York's confession that he killed Maureen Jurkiewicz was to observe that "you must have been pretty mad at the bitch." This is not a statement that required an answer, much less a confession to murder; moreover, York had already broached the subject of his wife's murder by relating that his son suspected him of murdering her. Regarding the destruction of the Just Friends Lounge and the death of Gail Maher, Beaman did ask York whether "he was going to make any money from it," but that was after York had already bragged that he was going to come into some money because his first conviction in that case had been reversed and related the details of the crime to Beaman. In neither case does it appear that Beaman was hot on the scent of information that could have proven particularly valuable to

him in light of Agent Stoll's indication that he was interested in information about murders.

Beaman's subsequent actions support this reading. Beaman thought York's statements were "rubbish," just another inmate bragging about his career accomplishments. Beaman did not report these statements to Agent Stoll until several months later when another inmate read a newspaper article to Beaman about the reversal of York's first conviction. Only then did Beaman conclude that York was telling the truth. Had Beaman been trying to pump information from York, it seems highly unlikely that he would have waited for independent corroboration before turning his information over to the FBI. As a government agent, Beaman's interests would have been best served by immediately telling Stoll what York had said and letting Stoll worry about corroboration. During the period when York made these statements, Beaman was meeting regularly with Agent Stoll on another matter. It is inconceivable that had these statements been the fruit of an attempt to deliberately elicit information from York that Beaman would not have reported them to Agent Stoll at that time. Beaman was a government agent when York made these statements, but, like the agent in *Kuhlmann,* did nothing to deliberately elicit the statements, so York's sixth amendment right to counsel was not violated by their admission into evidence.

### III. Gail Maher's Hearsay Statements

■ Two associates of Gail Maher, Carol Mroch and John Etscheid, testified at trial that Maher had told them that she and York planned to blow up the Just Friends Lounge to collect the insurance proceeds. Specifically, Mroch testified that Maher told her that she and York had discussed burning down the lounge and that if anything happened to the lounge, she would be given severance pay. Etscheid testified that Maher told him that she and York had discussed blowing up the lounge to collect the insurance proceeds. Maher, said Etscheid, told him that York knew a person who was going to show him how to blow up

the lounge by means of a natural gas explosion, but they weren't going to blow up the lounge until July because there was a wedding reception scheduled there earlier in the summer. York filed a motion in limine to exclude this testimony on the grounds that it was inadmissible hearsay and violated the confrontation clause of the sixth amendment. He failed, however, to renew his objections when the testimony was admitted. We therefore review his allegations of error under the plain error standard, for "[a] party whose motion in limine has been overruled must object when the error the party sought to prevent is about to occur at trial." *United States v. Roenigk,* 810 F.2d 809, 815 (8th Cir. 1987).

### A. Hearsay

■ The district court overruled York's hearsay objection on the ground that the statements were admissible under the penal interest exception to the hearsay rule. *See* Fed.R.Evid. 804(b)(3). We agree. "For a statement to qualify as a 804(b)(3) statement against interest, the government must show that the statement 'tended to subject' the declarant to criminal liability so that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true." *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990) (quoting *United States v. Wilkus,* 875 F.2d 649, 654 (7th Cir.1989)). Statements that "tend to implicate the declarant in a conspiracy are statements against his penal interest." *United States v. Layton,* 720 F.2d 548, 560 (9th Cir.1983), *cert. denied,* 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). In like vein, statements that demonstrate a declarant's inside knowledge of a crime are also against the declarant's penal interest. *Id.; United States v. Barrett,* 539 F.2d 244, 252 (1st Cir.1976). Each of Maher's statements suggests that she and York were conspiring to blow up the lounge, and that she was intimately involved in planning the crime. York argues to the contrary, but fails to rebut the incriminating nature of Maher's statements. He offers,

for example, only the conclusion that Maher's statement that Mroch would receive severance pay was not incriminating, refusing to even acknowledge the government's position that the statement showed that Maher was planning to destroy the lounge. The district court carefully reviewed these statements and concluded that they were statements against interest; York provides no basis for disagreeing, much less for determining that the court's conclusions amounted to an abuse of discretion.[1]

■ York also contends that the portions of Maher's statements that inculpated York were inadmissible because they did not subject her to criminal liability. That view ignores the fact that by naming York, Maher demonstrated her inside knowledge of yet another detail of the planned crime. *Layton,* 720 F.2d at 559–60. York's position nevertheless has some logical force. Exclusion of that portion of a statement against interest inculpating others was often (before the adoption of the Federal Rules of Evidence anyway) advanced as the approach most consistent with the rationale specifically embodied in the declaration against interest hearsay exception—that the declarant would not expose herself to criminal liability by making false statements. *See, e.g.,* McCormick, Evidence § 279 at 677 (2d ed. 1972); Jefferson, *Declarations Against Interest—"An Exception to the Hearsay Rule,"* 58 Harv.L.Rev. 1, 60–61 (1944). Admitting inculpatory statements against interest recognizes, however, the broader purpose behind this and other hearsay exceptions as well—to permit the use of evidence that is trustworthy (for whatever particular reason) and to exclude that which is unreliable. 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 804(b)(3)[02] at 804–138 (1990).

There is little question that the drafters of the Rules of Evidence and Congress intended Rule 804(b)(3) to permit admission of inculpatory statements where consistent with the confrontation clause of the sixth amendment. The advisory committee's notes reflect the view that a statement admitted under the rule "may include statements implicating [another], and under the general theory of declarations against interest they would be admissible as related statements." The cases give effect to this view. *See, e.g., United States v. Harty,* 930 F.2d 1257, 1263 (7th Cir.1991); *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990); *United States v. Casamento,* 887 F.2d 1141, 1171 (2d Cir.1989); *United States v. Fields,* 871 F.2d 188, 192 (1st Cir.1989). Moreover, Congress deleted a provision from the rule that would have prohibited the use of inculpatory statements against interest, "to avoid codifying, or attempting to codify, constitutional evidentiary principles...." S.Rep. No. 93–1277, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. and Admin.News at 7051, 7068. The report discussing this deletion went on to observe that "[c]odification of a constitutional principle is unnecessary and, where the principle is under development, often unwise." "As Congress recognized, the central underpinning of such a safeguard must be the confrontation clause of the United States Constitution." *United States v. Alvarez,* 584 F.2d 694, 700 (5th Cir.1978). To be admissible under rule 804(b)(3), then, the inculpatory portion of a statement against interest must be sufficiently reliable to satisfy the confrontation clause. There seems little reason to treat the requirement of reliability differently in each context. Such an approach would be needlessly complex, requiring two bodies of case law where one will do.

---

1. We also note that the district court refused to admit several statements attributed to Maher, namely that York wanted to sell the lounge but Maher was blocking a sale and that York was pressuring Maher to repay her debt to him. The district court concluded that these statements did not tend to incriminate Maher and were separable from the other statements that did. While the fact that the district court did not give the government everything it wanted does not preclude us from reviewing the basis for admitting the other statements, it does tend to suggest that the decision to admit the other statements was a principled exercise of the court's discretion.

**1362**

## B. Confrontation Clause

 York asserts that his sixth amendment right to confront witnesses against him was violated when the district court admitted Maher's hearsay statements. York cites *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to support his claim, but ignores the complex body of case law relating to the interplay of the confrontation clause with the hearsay rule, of which *Bruton* is but a part. In *Bruton*, the Court reversed the conviction of a defendant against whom the confession of a nontestifying codefendant was used as substantive evidence. The Court's ruling, however, was predicated upon the *inadmissibility* of the statement against the defendant under the rules of evidence;[2] the Court explicitly reserved judgment on the question of whether the use of an inculpatory hearsay statement against an accused would violate the confrontation clause when that statement was admissible under the rules of evidence applicable in the jurisdiction.[3] *See* 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3. Since *Bruton*, the Court has repeatedly observed that use of an inculpatory hearsay statement against an accused raises only a rebuttable presumption that the statement is unreliable. *Lee v. Illinois*, 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986); *Dutton v. Evans*, 400 U.S. 74, 83–86, 91 S.Ct. 210, 216–218, 27 L.Ed.2d 213 (1970) (plurality opinion); *see also New Mexico v. Earnest*, 477 U.S. 648, 649, 106 S.Ct. 2734, 2735, 91

L.Ed.2d 539 (Rehnquist, J., joined by Burger, C.J., and Powell and O'Connor, JJ., concurring in order vacating and remanding case for reconsideration in light of *Lee v. Illinois*) ("As *Lee v. Illinois* makes clear, to the extent that *Douglas v. Alabama* [380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) ] [on which *Bruton* was based] interpreted the Confrontation Clause as requiring an opportunity for cross-examination prior to the admission of a codefendant's out-of-court statement, the case is no longer good law."). In *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), the Court observed that if applied literally, the confrontation clause "would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." The Court therefore "concluded in *Roberts* that no independent inquiry into reliability is required when 'the evidence falls within a firmly rooted hearsay exception.'" *Bourjaily v. United States*, 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987) (quoting *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539); *see also Lee*, 476 U.S. at 543, 106 S.Ct. at 2063. "In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

The circumstances surrounding Maher's statements inculpating York—speaking to acquaintances unconnected to law enforcement—make them eminently trustworthy;

---

**2.** *Bruton* reflected the view that prevailed prior to the advent of the Federal Rules of Evidence that an inculpatory hearsay statement was inadmissible against an accused.

**3.** The Court thus created an anomaly that continues to this day. *Bruton* only prohibits the use of an inculpatory hearsay statement against an accused when the jurisdiction's rules of evidence do not permit that statement to be introduced into evidence against the accused. Where the rules so permit, *Bruton* is inapplicable. Thus, under *Bruton* and subsequent cases, whether an inculpatory hearsay statement violates the confrontation clause turns on the content of the rules of evidence. Professor James Haddad has written extensively on this anomaly, suggesting that the confrontation clause foundation of *Bruton* cannot sustain the weight of this contradiction. Professor Haddad sug-

gests that *Bruton*, if it is to survive at all, must come to be read as resting on due process considerations relating to the adequacy of limiting instructions rather than on the confrontation clause. *See* Haddad & Agin, *A Potential Revolution in Bruton Doctrine: Is Bruton Applicable Where Domestic Evidence Rules Prohibit Use of a Codefendant's Confession as Evidence Against a Defendant Although the Confrontation Clause Would Allow Such Use?*, 81 J.Crim.L. & Criminology 235 (1990); Haddad, *The Future of Confrontation Clause Developments: What Will Emerge When the Supreme Court Synthesizes the Diverse Lines of Confrontation Decisions?*, 81 J.Crim.L. & Criminology 77, 96–97 (1990); Haddad, *Post–Bruton Developments: A Reconsideration of the Confrontation Rationale, and a Proposal for a Due Process Evaluation of Limiting Instructions*, 18 Amer.Crim.L.Rev. 1 (1980).

so trustworthy, in fact, that the advisory committee used that scenario as an example of an inculpatory statement that "would have no difficulty in qualifying" for admission under 804(b)(3). *Compare United States v. Magana–Olvera,* 917 F.2d 401 (9th Cir.1990) (declarant's statement inculpating defendant in drug trafficking, made after declarant discovered that he had sold drugs to an undercover police officer, held unreliable). Notwithstanding the advisory committee's understandable caveat that it did not purport to suggest that the requirements for admissibility under Rule 804(b)(3) would satisfy the confrontation clause, we think that such statements satisfy those requirements. The " 'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must ... be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright,* —— U.S. ——, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990). The fear that inculpatory statements are unreliable stems largely from the presumption that such statements are self-serving, offered only to shift the blame from the declarant to another. But when, as here, the inculpatory portion of a statement is also against the declarant's interest, or when it is neutral because the declarant has not attempted to diminish his own role, there is little reason to suspect that portion of an otherwise reliable statement is untrustworthy. *See Lee v. Illinois,* 476 U.S.

530, 551–52, 106 S.Ct. 2056, 2067–68, 90 L.Ed.2d 514 (1986) (Blackmun, J., dissenting) (inculpatory hearsay statement satisfied confrontation clause because the statements "were thoroughly and unambiguously adverse to [declarant's] penal interest," reducing likelihood that inculpatory portions were self-serving).

In *Garcia* we therefore rejected a claim that admission of an inculpatory hearsay statement under rule 804(b)(3) violated the defendant's sixth amendment right to confront witnesses against him. While we did not expressly state that the statement against penal interest exception to the hearsay rule is "firmly rooted," we observed that the reliability of the inculpatory statement at issue in that case had been adequately established for purposes of the evidentiary rule, thereby satisfying the requirements of the confrontation clause as well. 897 F.2d at 1421. Our holding in *Garcia* was tantamount to saying that the exception is well-rooted within the meaning of *Roberts* and *Bourjaily,* and we affirm that view today.[4] "The hearsay exception for declarations against interest is firmly established; it rests upon 'the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect.' " *Lee,* 476 U.S. at 551, 106 S.Ct. at 2067 (Blackmun, J., joined by Burger, C.J., and Powell and Rehnquist, JJ., dissenting); *see also Dutton,* 400 U.S. at 89, 91 S.Ct. at 219 (plurality opinion) (That a

---

**4.** *Morrison v. Duckworth,* 929 F.2d 1180, 1182 n. 2 (7th Cir.1991) is not inconsistent with this view. In *Morrison* we held that the nontestifying codefendant's confession implicating Morrison did not fall within a firmly-rooted hearsay exception, relying on the statement in *Lee v. Illinois* that "declaration against penal interest" "defines too large a class for meaningful Confrontation Clause analysis." 476 U.S. at 544 n. 5, 106 S.Ct. at 2064 n. 5. That statement must be read in context, for *Lee* involved not a "simple" declaration against penal interest, but "a confession by an accomplice which incriminates a criminal defendant." *Id.* The *Lee* majority did not rule that the declaration against interest exception to the hearsay rule was not a firmly-rooted exception; it held merely that the accomplice's *inculpatory* declarations were presumptively unreliable because they were not against interest (it was whether the inculpatory

portions of the confession were reliable, not whether the declaration against interest hearsay exception is firmly rooted, on which the majority and dissent disagreed). *Morrison* stands for the same proposition, and is not inconsistent with our holding that the statement against interest exception of Rule 804(b)(3) is firmly rooted. But as we held in *Garcia,* and reaffirm today, to be admitted under Rule 804(b)(3), the inculpatory portion of a statement against interest must be sufficiently reliable (whether because it too is against interest or for some other reason) to satisfy the confrontation clause. *Morrison* involved state, not federal, evidentiary rules, and assumed admissibility under a declaration against interest theory absent that requirement; it did not address the requirements for admissibility of inculpatory statements under the federal rule.

statement is against penal interest is an indicator of reliability that has been "widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant."). So long as the incriminating and inculpatory portions of a statement are closely related, *see Casamento, supra,* if the circumstances surrounding the portion of a declarant's statement inculpating another are such that the court determines that the inculpatory portion of the statement is just as trustworthy as the portion of the statement directly incriminating the declarant, there is no need to excise or sever the inculpatory portion of the statement. Maher's inculpatory statements were admissible under Rule 804(b)(3) and therefore there was no confrontation clause violation.[5] *Accord United States v. Stratton,* 779 F.2d 820, 830 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *United States v. Alvarez,* 584 F.2d at 701.

## IV. Prosecutorial Vindictiveness

■ After York successfully appealed his first conviction, the government sought and obtained a superseding indictment against him. The new indictment added a charge of obstruction of justice, arising from York's threats to kill his son after Tommie York invoked the fifth amendment and refused to testify at his father's first trial. In *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), the Supreme Court held that the due process clause prohibits the government from bringing more serious charges against a defendant unless the prosecutor comes forward with objective evidence demonstrating that the new charges could not have been brought before the defendant exercised his constitutional rights. York characterizes the addition of the obstruction of justice charge against York as an impermissible attempt to punish him for exercising his constitutional right to appeal his first conviction because the government knew of the threats before York's first trial began.[6] The government counters that York's son was effectively unavailable as a government witness until November 1988 because Tommie had previously invoked his fifth amendment privilege against self-incrimination and refused to testify at his father's trial. Tommie's unavailability, the government maintains, precluded it from bringing the obstruction charge against York at his first trial.

The government's position oversimplifies the matter. Tommie York invoked the fifth amendment to preclude questions relating to his conduct during the investigation of the Maher murder, not to preclude questions about events surrounding the threats York made *after* his son invoked the fifth amendment. There is nothing in the record to suggest that Tommie's fear of self-incrimination extended to those incidents, nor is there anything to suggest that he was unwilling to testify about them. The government never sought to question him about those events; it had no way of knowing whether or not he would have refused to testify about them.

Nevertheless, we agree that Tommie was effectively unavailable to the government. During his father's second trial, Tommie testified that he had taken the fifth amendment because he feared his father. York had pressured his son to lie on the witness stand; Tommie apparently believed that by

---

**5.** We are aware of no circuit that has held that the level of reliability required for admissibility under Rule 804(b)(3) is insufficient to satisfy the confrontation clause. Several have left the question open after making an independent determination that the hearsay statement at issue was sufficiently trustworthy. *See United States v. Fields,* 871 F.2d 188 (1st Cir.), *cert. denied,* ⸺ U.S. ⸺, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989); *United States v. Candoli,* 870 F.2d 496 (9th Cir. 1989).

**6.** York also contends that the ten-year sentence he received for these threats evinces vindictiveness on the part of the district court. York's sentence was well within the sentence authorized by law, however, and York fails to cite a single piece of evidence to support his claim that the district court was motivated by any improper consideration in awarding the sentence. The advocacy of the able appellate counsel in this case has been vigorous and professional in all other respects, but this allegation of error is without merit and exceeds appropriate bounds of zealous representation.

not testifying he could avoid perjuring himself while also avoiding his father's wrath if he testified (truthfully) against him. He claimed the privilege on that basis.[7] We doubt that his father's threats after he took the fifth did anything to assuage Tommie's fears; he undoubtedly would have refused to cooperate had the government sought to question him about the incidents, and certainly would have again sought refuge in the fifth amendment had the prosecution charged York with obstruction at that time and called Tommie as a witness. True, the district court might not have permitted Tommie to invoke the privilege in that case, but we will not infer a prosecutorial vendetta from what appears to us to have been an admirable case of prosecutorial restraint. The prosecution could have tried to add the obstruction charge to York's first trial, and might have been able to force his son to testify about that charge despite his prior invocation of the fifth amendment, but the prosecutors opted not to badger a young witness to testify against a father he feared solely to pile on another charge at that late date. It was only when Tommie York approached the prosecutors two years later that the government sought to add the obstruction charge to York's pending retrial. The government's conduct in this case simply does not support the notion that it was seeking retribution for York's successful appeal, or that it was seeking to chill other defendants from appealing their convictions.

### V. The Voir Dire of Dr. Spitz

 The defense tendered Dr. Werner Spitz, a forensic pathologist, as an expert witness. The defense qualified Dr. Spitz as an expert in front of the jury; among the qualifications presented was Dr. Spitz's sixteen year tenure as the chief medical examiner for Wayne County, Michigan. With the court's permission, the prosecution conducted a voir dire of Dr. Spitz that focused on several instances of

allegedly unprofessional conduct he committed while he was the chief medical examiner. The prosecutor asserted that Dr. Spitz had unlawfully permitted the Detroit police department to conduct gunshot experiments on corpses and that he had unlawfully channeled the proceeds from the sale of body parts from corpses to a private foundation rather than turning the proceeds from those sales over to the county as required by law. York protests on appeal that this voir dire was improper under Rule 608(b) and that the prosecutor questioned Dr. Spitz without a good faith basis for his claims.

There is no merit to either claim. Under Rule 702, a witness must qualify as an expert in order to testify about "scientific, technical, or other specialized" matters. To that end, the defense introduced evidence of Dr. Spitz's professional qualifications, including his lengthy stint as the chief medical examiner of Wayne County, Michigan. The prosecution had a right to challenge the adequacy of those qualifications. *See, e.g., United States v. Ramirez,* 796 F.2d 212, 216 (7th Cir.1986); *Backes v. Valspar Corp.,* 783 F.2d 77, 79 (7th Cir. 1986). Its questions about Dr. Spitz's professional conduct while he held the office of chief medical examiner were relevant to the weight to be accorded that credential by the district court. If, as the prosecution maintained, Dr. Spitz conducted some of his official duties in an unprofessional manner, the district judge and the jury could have reasonably discounted the value of that service for establishing Dr. Spitz's professional qualifications. Moreover, while the adequacy of professional qualifications obviously bears upon the credibility of an expert witness, the inquiry into such qualifications is a preliminary question governed by Rule 104(a), which states expressly that other rules of evidence do not apply to the court's determination respecting, among other things, the qualification of a

---

7. The trial judge permitted Tommie to invoke the privilege on the belief that his testimony was going to be that he had lied to government agents during the course of the Maher investigation. Tommie mistakenly believed, however, that he could invoke the privilege merely in order to avoid testifying against his father.

person to be a witness.[8] York's invocation of Rule 608(b) is therefore futile; that rule does not apply in the context of a witness voir dire. We accord significant discretion to trial judges to control the scope of voir dire examinations, *Ramirez*, 796 F.2d at 216; *United States v. Winograd*, 656 F.2d 279, 282 (7th Cir.1981), *cert. denied sub nom. Siegel v. United States*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and for good reason. "Because the universe of experts is defined only by the virtually infinite variety of fact questions in the trial courts, the signals of competence cannot be catalogued." *Eymard v. Pan American World Airways*, 795 F.2d 1230, 1234 (5th Cir.1986). The same holds true of signals of incompetence. The court could, perhaps, have conducted the voir dire entirely outside the presence of the jury, but once the defense had been permitted to qualify Dr. Spitz in front of the jury, we do not think it error for the judge to have permitted the government to challenge Dr. Spitz in front of the jury as well, particularly when the defense was able to mount an extensive rehabilitation effort immediately afterward.

As for York's assertion of the prosecutor's bad faith, it is completely without foundation. York contends that the government relied on a preliminary investigatory report issued by the local prosecutor in Wayne County that raised questions about the gunshot experiments and Dr. Spitz's role in selling body parts to benefit a private non-profit institution he founded. The findings of that report, York maintains (as did Dr. Spitz at trial) were ultimately rejected by the district attorney, and Spitz was never charged with any illegal activity. York provided no evidence, however, to support his claim that the findings of the report were rejected. Nor does he offer any evidence that the prosecutor relied on the report in bad faith. The record establishes the contrary. Before the district judge permitted the prosecutor to challenge Dr. Spitz, she inquired into the basis for his questions. The prosecutor was able to establish a good faith basis for his questions about these incidents without referring to the investigatory report at all. Dr. Spitz, it seems, had been asked about the same incidents at several other trials in which he testified. In one, he admitted that while medical examiner he permitted the removal and sale to other institutions of body parts and that he did not turn the proceeds of those sales over to the county as he was required to do by law. As the district court told York's counsel when it objected at the time, "He's [the prosecutor] got it in the transcript that the man admitted it." As for the gunshot experiments, Dr. Spitz admitted in at least one other trial that he authorized such experiments. The prosecution also discovered that Dr. Spitz had written and published several articles based on the results of those experiments. The prosecution knew of the Wayne County investigatory report, but did not rely on it to establish a basis for questioning Dr. Spitz about these incidents. The prosecution obviously researched the voluminous material associated with Dr. Spitz's frequent testimony as an expert witness and found that it did not need to rely on the reports of others to discredit the doctor; his own words did the job well enough.

## VI. Tainted Venire

■ At the outset of the jury selection process, in front of the entire venire, one of the prospective jurors volunteered that he had read a newspaper article several years before about York's case. According to the prospective juror, "the implication [of the article] was that the defendant was guilty." When the judge asked whether his knowledge of the article would have an effect on his ability to serve as a juror, he answered that it would. At that point, defense counsel requested a side bar and asked the judge to excuse the entire venire

---

**8.** Rule 104(a) reads:

Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

due to the possibility that these comments prejudiced other members of the venire. The district court declined to dismiss the venire, but polled its members individually to determine if they had overheard the comment, and if they had, to determine whether they could still be impartial. Several of the members of the venire who heard the remark ultimately served on York's jury. York maintains on appeal that the district court's refusal to dismiss the entire venire deprived him of his constitutional right to a fair trial.

We disagree. In *Irwin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961), a case York cites to support his claim, the Supreme Court observed:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Each member of the venire was polled by the district judge and indicated that the remarks in question would not adversely affect his or her ability to be fair. York denigrates the responses of the venire members, describing them as "perfunctory," but does not explain why the district court should not have relied on them.

York maintains that we should presume as biased anyone who has discovered information about a defendant's past criminal record or previous conviction in the same case. In the cases he cites, however, "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975) (describing cases cited by appellant). By contrast, York claims error on the basis of a single comment of a prospective juror who was unknown to the other members of the venire, a comment that, by our count, fewer than half of the members of the venire could even recall. Those who did recall the comment affirmed that it would have no effect on their ability to serve as impartial jurors.[9] Absent any reason to suspect that these responses were untrue, we must credit them; "surely one who is trying as an honest man [or woman] to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950).

## VII. Jury Instructions

York aims the last arrow in his quiver at the instructions given by the district court on mail fraud. The district court read this Circuit's pattern instruction for mail fraud to the jury.[10] York maintains that the instruction should have specified that the

---

9. As in *Murphy*, the improper remark prompted at least one individual to be, if anything, more favorably disposed toward the defendant. When asked if the remark had any effect on him, one juror answered that "it made me mad because that's the way newspapers do you." Compare *Murphy*, 421 U.S. at 801, 95 S.Ct. at 2036 (one juror "suggested that people who have been in trouble before are too often singled out for suspicion of each new crime—a predisposition that could only operate in petitioner's favor.").

10. Our pattern instruction reads:
 To sustain the charge of mail fraud, the government must prove the following propositions:
 First, that the defendant knowingly participated in the scheme to defraud *as described in the indictment.*

Second, that for the purpose of carrying out the scheme or attempting to do so, the defendant caused the United States Mails to be used *in the manner charged in the particular count;* and
 Third, that the defendant did so knowingly and with the intent to defraud.
 If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
 If, on the other hand, you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.
 2 Federal Criminal Jury Instructions of the Seventh Circuit 88 (1984) (emphasis added).

jury had to find beyond a reasonable doubt that York killed Maher in order to convict him on the mail fraud counts. The claim is without merit. The instruction referred the jury to the fraudulent scheme described in the indictment, namely, York and Maher's scheme to blow up the lounge and collect the proceeds from their insurance policy on the buildings (Count 3) and York's plan to kill Maher and to collect the proceeds from her life insurance policy (Counts 4 and 5). To convict York on Counts 4 and 5, then, the jury had to find that York killed Maher. Those counts allege no other scheme; had the jury found that the government failed to prove the murder scheme, it would have had no alternative but to acquit York on those counts.

VIII. Conclusion

Thomas York received a fair trial. We therefore affirm each of his convictions.