[No. S015623. Dec. 23, 1993.]

In re CHARLES FREDERICK NEELY on Habeas Corpus.

902

## Counsel

Karen S. Sorensen, under appointment by the Supreme Court, for Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Arnold O. Overoye and Robert R. Anderson, Assistant Attorneys General, Lisbeth M. P. Bellet, Roger E. Venturi and Ward A. Campbell, Deputy Attorneys General, for Respondent.

## Opinion

**GEORGE, J.**—While his appeal from a judgment imposing the death penalty was pending before this court (see *People* v. *Neely, ante,* p. 877 [26 Cal.Rptr.2d 189, 864 P.2d 460]), petitioner Charles Frederick Neely filed the petition for writ of habeas corpus which gave rise to the present proceeding. This petition, in part reiterating petitioner's contentions on appeal, alleged, among other claims, that numerous failings by his trial counsel deprived petitioner of his right to the effective assistance of counsel. Concluding that the petition stated a prima facie claim for relief, we issued an order to show cause returnable before this court and ordered that the matter be argued with the automatic appeal.

For the reasons discussed hereafter, we conclude that petitioner is entitled to habeas corpus relief and that the judgment must be set aside in its entirety.

### I

The factual and procedural background to petitioner's conviction and sentence of death, and to the present habeas corpus proceeding, is set forth fully in the companion case of *People* v. *Neely, supra, ante,* at pages 881-892, and need not be repeated here except to note that "[t]he victim, Bruce Chester, a realtor, conducted his business from his residence on Cameron Road in Cameron Park, where he also kept small amounts of marijuana and cocaine for his personal use. On March 15, 1982, [petitioner], Malcolm Centers, and Monte Handley robbed Chester at his residence, and [petitioner] shot and fatally wounded him." (*Id.,* at p. 881.)

Among petitioner's allegations in the habeas corpus petition are the following: that (1) he was deprived of the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, because his trial attorney

provided deficient representation in numerous respects, including counsel's failure to seek a change of venue for petitioner's trial, conduct adequate voir dire examination of the potential jurors or exercise any of the peremptory challenges available to the defense, investigate evidence from which counsel would have ascertained the basis for the suppression of the tape recording and transcript of a March 23, 1982, postarrest conversation between petitioner, Centers, and Handley in a sheriff's van (see *People* v. *Neely, supra, ante,* at pp. 887-888),[1] or raise an objection to the admission of the tape recording and transcript under *Massiah* v. *United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 250, 84 S.Ct. 1199] (*Massiah*), and its progeny; and (2) he was deprived of his rights of confrontation, compulsory process, and a fair trial under both the state and federal Constitutions, as a result of prosecutorial misconduct in depriving petitioner of a critical defense witness by coercing codefendant Handley not to testify at petitioner's trial.

After reviewing the petition, we determined it stated a prima facie case for habeas corpus relief with regard to trial counsel's alleged failings involving selection of an impartial jury and suppression of the tape-recorded van conversation. Accordingly, we issued an order to show cause.

Upon the filing of a return and a traverse, we determined there were disputed factual issues requiring an evidentiary hearing with respect to the ineffective assistance of counsel claim involving trial counsel's failure to investigate and raise a *Massiah* objection to the admission at trial of the tape recording of the van conversation. We therefore appointed the Honorable Ronald W. Tochterman, Judge of the Sacramento County Superior Court, as a referee to take evidence and make findings of fact on seven specified questions related to the adequacy of the performance of petitioner's trial counsel.

The reference order directed that the referee take evidence and make findings on the following questions:

"1. What was the understanding, if any, between Malcolm Centers and the El Dorado County Sheriff's office concerning Centers' actions in connection with the conversation in the police van between defendant, Centers, and Monte Handley on March 23, 1982?

"2. What facts were known by defense counsel relating to the question whether the conversation of March 23, 1982, in the police van could have

---

[1]The petition further alleged prosecutorial misconduct in failing to disclose "*Brady* material" (*Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]) to the defense, related to the tape recording of the March 23, 1982, van conversation. We summarily denied the petition with respect to this claim and therefore do not discuss this allegation, in light of our conclusion that the judgment must be set aside on other grounds.

been suppressed under the Sixth Amendment on the ground that Centers was acting as a police agent?

"3. What inquiry, if any, did counsel undertake to determine whether Centers was acting as a police agent?

"4. What further inquiry, if any, should counsel have undertaken?

"5. What additional facts, if any, would such an inquiry reveal?

"6. Why did counsel refrain from moving to suppress evidence of the March 23 conversation on the ground that the evidence of that conversation was procured in violation of the Sixth Amendment?

"7. In light of those facts known, or which should have been known, to counsel, should counsel have moved to suppress the March 23 conversation on the ground that the evidence of that conversation was procured in violation of the Sixth Amendment?"

Judge Tochterman heard testimony, received exhibits, and submitted a report with extensive factual findings. As discussed in detail, *post*, he concluded that the facts known to petitioner's trial counsel relating to the tape recording of the van conversation should have prompted further investigation, and, in light of the facts that would have been discovered following diligent investigation, trial counsel should have raised an objection to the admission of the tape recording on the ground it was procured in violation of the Sixth Amendment to the United States Constitution as that provision has been interpreted by *Massiah* and its progeny.

As we explain, we conclude that petitioner's claim of ineffective assistance of counsel, based upon counsel's failure to raise a *Massiah* objection to the tape recording, has merit and that petitioner is entitled to habeas corpus relief on that ground. We therefore need not and do not discuss the other claims of ineffective assistance of counsel raised by petitioner.

## II

■ To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner. (*Strickland* v.

*Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052]; *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)

Applying this standard, we review petitioner's claim of ineffective assistance based upon trial counsel's failure to seek suppression of the tape recording of the March 23 van conversation on the ground of *Massiah* error.

1. *Background.*

The factual and procedural background established by the appellate record relevant to petitioner's claim is set forth in our opinion in the companion case of *People* v. *Neely, supra, ante,* at pages 881-892. We shall summarize below the pertinent declarations submitted in support of the petition, the return, and the traverse, the evidence adduced at the evidentiary hearing, and the general factual findings set forth in the referee's report. ■ " 'Our standard of review of the referee's report is settled. The referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. [Citations.] . . . The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying. [Citation.]' " (*In re Jackson* (1992) 3 Cal.4th 578, 585 [11 Cal.Rptr.2d 531, 835 P.2d 371].)

At the time of his arrest on March 15, 1982, on charges related to the crimes in the present case, Centers had been acquainted with Deputy Erol Harnage for approximately 10 years. Centers had assisted Harnage or, through him, other law enforcement officers, by providing information relating to criminal activities, including unsolved crimes in which Centers was implicated. Approximately two weeks prior to his arrest on March 15, Centers furnished Deputy Harnage with information relating to several burglaries committed in Placer and El Dorado Counties, including the location of the items stolen. Although Centers was suspected of personal complicity in the commission of these crimes, no ensuing charges were filed against him. In connection with the investigation of these burglaries, Harnage informed a fellow deputy (Chalmer DeCecco) that he was acquainted with Centers sufficiently to know that, if implicated in the commission of a crime, Centers "would give everybody up, except his mother."

Based upon his preexisting relationship with Centers, Deputy Harnage believed that, if pressure were brought to bear upon him, Centers would

cooperate with law enforcement in obtaining information inculpating petitioner and Handley. In fact, within hours of his arrest for the Chester murder, Centers furnished lengthy statements incriminating petitioner and identifying him as the person who shot Chester with petitioner's "22." In a tape-recorded March 15 interview with Deputies Harnage and Wilson, Centers expressed bitterness at petitioner's having put him "in a spot" and told the deputies, "I want him down." He agreed to assist the authorities in apprehending petitioner, offering to direct them to petitioner's residence in Laytonville. Centers also told the deputies that, by making a telephone call, he could discover where petitioner was hiding ("I got it. . . . Chuck [petitioner] gave me the phone number where he's staying here in Sacramento . . . .").

Centers testified that, prior to the March 23 van ride, Harnage told him repeatedly in the course of the various interviews that Centers could be charged with anything from first degree murder to a parking ticket, depending upon the degree of Centers's cooperation with the authorities and the amount of information he furnished about petitioner. Centers further related that he had been told by Harnage that, if Centers cooperated "100 percent" in providing information concerning petitioner, some of the "charges would be knocked off." The transcript of the tape-recorded March 15 interview partially corroborates Centers's testimony, reflecting that Harnage told him that, after receiving the sheriff's report, the district attorney's office could charge him with anything from a traffic ticket to a homicide.

In a March 17 conversation between Centers and Handley, surreptitiously tape-recorded while the two men were being transported to court, when Handley remarked to Centers that Officer Harnage "said he's going to give us a chance, man, we might get probation," Centers replied, "He's the one . . . I helped fuckin get all the . . . people on those burglaries . . . he's [an] alright dude . . . ."

On March 17, Centers was observed in his jail cell tying a mattress cover around his neck in a purported suicide attempt. On March 18, another inmate, Ken Weaver (in custody for driving under the influence), was moved into Centers's cell. Weaver began giving Centers fatherly advice, counseling him as to the manner in which he could defend himself. Weaver told Centers that he was relaying information given him by Centers to the authorities, specifically Lieutenant Rance Cook. The jail log reflects that, on March 19, Weaver was taken from his cell for an interview with "detectives." The referee concluded that the "interview obviously did not concern matters relating to Mr. Weaver's own case; he was in custody for drunk driving."

The jail log reflects that on three separate occasions on March 18, Centers was taken from his cell to the detective offices or to speak with Russ

Herman (a district attorney's investigator). Centers's attorney at that time had agreed that his client could speak with law enforcement authorities. As reflected in a transcript of a tape-recorded interview conducted on that date, Herman told Centers that "everybody has to think of themself," and that if the authorities received only 80 percent from Centers, they would give him only 80 percent. Centers later stated, "I will talk because I'm not the strong type, I won't hold out. Someone put me in a damn spot[.] I ain't going to go down for them, no god damn way."

Following petitioner's arrest on March 18, he invoked his right to remain silent, and at his arraignment on March 19 he requested appointment of counsel. Attorney David Weiner was appointed to represent him. Deputy Harnage testified that he and Deputy Wilson were eager to discover the location of petitioner's gun, which they believed to be the murder weapon. By recovering the gun, they hoped to identify petitioner as the actual perpetrator of the fatal shooting. They believed that, in the event they could retrace petitioner's path of escape from the Chester residence, they could locate the missing weapon. Because they were unable to elicit these facts from petitioner directly, the deputies set out to induce Centers to obtain this information from petitioner.

Prior to March 23, Deputies Harnage and Wilson initiated several conversations with Centers with the objective of locating the murder weapon. In an unrecorded interview, Harnage told Centers that the deputies were seeking to learn the direction in which petitioner had fled from the Chester residence, so as to guide their search for petitioner's gun. Centers testified that Harnage told him that he (Centers) could not ask petitioner any questions *directly*, but could "mill around them," discuss the weapon in a "round about way," and "talk about things to get him [petitioner] to talk about the crime." Centers further testified that Harnage "asked me several times that if I understood that I could not ask him direct questions, and I said I understood that, and he ran over it with me a couple of times and give me an example of how to do it." Harnage provided Centers with specific examples of how to "break the ice" and get a conversation "rolling."

Deputy Harnage denied having prompted Centers to elicit information from petitioner. He testified at the evidentiary hearing that, although (following petitioner's arrest) Centers repeatedly offered to procure from petitioner whatever information was sought by Harnage, Harnage admonished him to refrain from doing so, explaining that, under such circumstances, Centers would be acting as a police agent. *The referee concluded, however, that Deputy Harnage's testimony in this regard was not credible.*

The jail log reflects that on March 22 (the day preceding the van ride) Centers had at least two meetings with law enforcement officers and Herman, the district attorney's investigator. In a tape-recorded portion of an

interview, Herman told Centers he was "in a heap of trouble"; the only way "we can do anything about the trouble you're in is to know the true facts"; and if Centers gave them only half "of it" (and withheld half), "you can't expect a hell of a lot from us."

According to Centers, in unrecorded portions of these interviews Wilson and Herman indicated to him that they would devise some means of enabling him to "pump" petitioner.

District Attorney Ronald Tepper (who was deceased by the time of the evidentiary hearing) and Deputy Wilson thereafter did precisely that, arranging for the three codefendants to be transported together to court in a sheriff's van in which a microphone and tape-recording device had been concealed. (Deputy Harnage was not involved in the decision to install this device in the van.)

The jail log reflects that on the morning of March 23, Weaver was taken from his cell for an interview with Lieutenant Cook. The interview lasted 20 minutes, after which, at 10:50 a.m., Weaver was returned to the cell he occupied with Centers. Centers testified that upon Weaver's return, Weaver told him that petitioner had been furnished a copy of a newspaper containing articles recounting the circumstances of petitioner's arrest, thus providing Centers with a topic of conversation during the van ride to court. Weaver had with him, and gave to Centers, a copy of the same newspaper (containing front-page articles about petitioner's arrest and depicting members of the Huntington family as heroes) so that Centers could read it before the van ride, and suggested that Centers ask petitioner whether he had read the newspaper.

Corroborating this version of events, the jail logs establish that a copy of the March 22 Mountain Democrat was furnished to petitioner at 7:22 p.m. on March 22. Newspapers normally were not provided to inmates. One of the articles referred to statements made by Centers implicating petitioner as the actual shooter.

Thereafter, en route to court in the sheriff's van, Centers made statements likely to evoke incriminating remarks from petitioner, and petitioner in fact made such remarks regarding the crimes and the murder weapon.

Centers asked petitioner whether he had read the local newspaper reporting the circumstances of petitioner's arrest, and petitioner responded that he had. Petitioner then suggested that they fabricate a story regarding their involvement in the crimes, proposing to tell the authorities they had hired

two men to intimidate Chester in order to recover some "dope" they had "fronted" him, and when these men failed to reappear, the three codefendants entered Chester's home and found his body.

Centers interjected: "Yeah. But I . . . I didn't even go into the house." (Ellipses in original.) Petitioner replied, "I know," and then complained that "[Chester's] fuckin' old lady was in there all the time." Centers continued, apparently relating the substance of his interview with the authorities: "Man, they keep on askin' me where was I in the house. I say, 'Hey, man, I wasn't in that house. They just went up t[o],' you know, to get the money that was owed. And that's it, you know, as far as I know, to my knowledge. . . . And they wouldn't even believe me. They just kept on telling me, they says, 'Well, we talked to Handley and he told us this, this and this.'"

Eventually petitioner remarked that the authorities would discover his gun: "They're going to find that fuckin' pistol, I'm sure." Centers inquired, "Well, where's it at," and again asked, "What'd you do with it." The following colloquy then ensued: "[PETITIONER:] I threw it away. I didn't bury it or nothin' . . . . It's been rained on. It might rust a little bit before they find it. [¶] [CENTERS:] I don't think they'll even find it. They aren't (INAUDIBLE) give up the search. They found Handley's. [¶] [PETITIONER:] Well, it says in the papers they're still looking for a .22." (See partial transcription of tape recording in *People* v. *Neely, supra, ante,* at p. 888.)

Centers also referred to the local newspapers' depiction of the Huntingtons as heroes, corroborating that he too had been furnished a newspaper on the morning of March 23.

On the evening of March 23, Centers requested a meeting with Deputy Harnage. As reflected by the transcript of the tape recording of that meeting (at which Deputy Wilson also was present), Harnage at the outset stated that "Malcolm Centers had asked me to come in and talk with him regarding this case," and then read to Centers the *Miranda* advisements (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). After waiving his rights, Centers related, among other matters, his conversation with petitioner during the van ride, including petitioner's disclosure that he had not buried his gun. When asked by Deputy Wilson why he had decided to speak to the deputies, Centers replied, "Because I want to know what Earl [Harnage] would want me to do . . . ." When reminded by Wilson of the seriousness of the charges pending against him, Centers replied, "That's right, that's exactly why I'm trying to cooperate . . . ."

Weiner testified that, following his appointment as petitioner's trial counsel, he was provided transcripts of the numerous tape recordings of police

interviews conducted with Centers and Handley, as well as the surreptitiously tape-recorded March 17 and March 23 van conversations. Prior to the preliminary hearing, he suspected that Centers was cooperating with and acting as an "agent" of law enforcement in attempting to elicit information from petitioner. He was aware that Centers previously had acted as a police informant. Centers's trial attorney and Centers's father, however, told Weiner that Centers had not been acting as a police agent. Immediately prior to the preliminary hearing, in a courtroom corridor, Weiner approached Deputy Harnage and asked him whether Centers was working for the law enforcement authorities as their agent or informant, and specifically whether Centers had been acting on behalf of the authorities during the March 23 van ride. Harnage replied in the negative, telling Weiner that he (Harnage) had not known in advance that the van would be "bugged." According to Harnage, the courtroom corridor conversation lasted approximately 20 seconds. In his declaration, Weiner stated he had known Harnage for years as "an honest, straight-talking law enforcement officer."

Weiner also recalled having made a similar inquiry of Deputy Wilson, who had replied that Centers was not acting at the behest of law enforcement authorities. Weiner's files do not contain any notes or other memoranda memorializing these discussions.

Following the preliminary hearing, Weiner decided not to seek suppression of the March 23 tape recording of the van conversation on the ground petitioner's statements had been procured in violation of *Massiah*. In his declaration, he explained that, at that time, Centers was unavailable as a witness and, thus, in his opinion, there did not exist a sufficient factual basis to support a motion to suppress premised upon *Massiah* error.

Petitioner's expert witness, an attorney specializing in criminal defense, testified that in his opinion, on the basis of the materials made available to Weiner following his appointment, a reasonably competent attorney should have concluded that at the time of the March 23 van ride, Centers was assisting law enforcement authorities in eliciting incriminating information from petitioner. He further testified that the investigation undertaken by counsel, to determine whether Centers in fact had been acting as an agent for the authorities, did not meet the standards of a reasonably competent criminal defense attorney.

An expert witness called by respondent testified that Weiner's performance did not fall below an objective standard of reasonableness under prevailing norms.

## 2. *Legal principles governing the claim of Massiah error.*

■ In *Massiah, supra,* 377 U.S. 201, the United States Supreme Court held that once an adversarial criminal proceeding has been initiated against the accused, and the constitutional right to the assistance of counsel has attached, any incriminating statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against that defendant. (*Id.,* at pp. 206-207 [12 L.Ed.2d at pp. 250-251]; *In re Wilson, supra,* 3 Cal.4th at p. 950.) In order to prevail on a *Massiah* claim involving use of a government informant, the defendant must demonstrate that both the government and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. (*Kuhlmann* v. *Wilson* (1986) 477 U.S. 436, 459 [91 L.Ed.2d 364, 384, 106 S.Ct. 2616].) Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements. (See *Depree* v. *Thomas* (11th Cir. 1991) 946 F.2d 784, 793-794; *U.S.* v. *York* (7th Cir. 1991) 933 F.2d 1343, 1357; *McCleskey* v. *Zant* (11th Cir. 1989) 890 F.2d 342, 348, and fn. 7; *United States* v. *Geittman* (10th Cir. 1984) 733 F.2d 1419, 1427.)

■ Where the informant is a jailhouse inmate, the first prong of the foregoing test is not met where law enforcement officials merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1240 [275 Cal.Rptr. 729, 800 P.2d 1159].) In order for there to be a preexisting arrangement, however, it need not be explicit or formal, but may be "inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct" over a period of time. (*U.S.* v. *York, supra,* 933 F.2d at p. 1357.) Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government. (*Id.,* at p. 1356.)

As to the second prong, that of deliberate elicitation, actual interrogation by an informant is not required in order to satisfy this element. (*United States* v. *Henry* (1980) 447 U.S. 264, 270-273 [65 L.Ed.2d 115, 122-124, 100 S.Ct. 2183].) Thus, where a fellow inmate, acting pursuant to a prearrangement with the government, "stimulate[s]" conversation with a defendant relating to the charged offense (*Id.,* at p. 273 [65 L.Ed.2d at p. 124]), or actively engages the defendant in such conversation (see *In re Wilson, supra,* 3

Cal.4th at p. 954), the defendant's right to the assistance of counsel, as defined by *Massiah*, is violated.

### 3. *Referee's findings and conclusions.*

The referee, in response to the specific factual questions referred to him, rendered the following findings and conclusions.

Centers and the El Dorado County Sheriff's office had an "implied understanding" that the deputies would create a situation enabling Centers to initiate a conversation with petitioner relating to the murder weapon, and to elicit from petitioner admissions concerning the location of that weapon. In exchange for his cooperation, the officers would intercede on Centers's behalf in an effort to secure leniency for him in connection with the charges pending against him.

More specifically, Deputy Harnage had a long-standing relationship with Centers whereby Centers acted as an informant in exchange for lenient treatment for his own complicity in various criminal offenses. Taking advantage of this preexisting relationship, Deputy Harnage, with the assistance of Deputy Wilson and Investigator Herman, solicited Centers's cooperation and instructed him regarding the means of eliciting information from petitioner regarding the latter's escape route and the location of the murder weapon. The referee concluded that "at the time of the March 23 van conversation, Mr. Centers was acting as the agent, and under the general direction, of Detective Harnage and Sergeant Wilson," and that in actively engaging in conversation with petitioner during the van ride, Centers "was acting on a suggestion emanating from the police/prosecution team, conveyed to him on the morning of March 23 by his cellmate, when he 'broke the ice' by asking petitioner whether he had read the newspaper story."

The referee further concluded that on the basis of the information known or made available to petitioner's trial counsel, counsel should have recognized (and *did* recognize) the possibility of *Massiah* error in the surreptitious tape recording of the van conversation. In support of this conclusion, the referee identified, among other factors known to or made available to petitioner's trial counsel, evidence of the preexisting relationship between Centers and Harnage, and the taped interviews revealing the following: Centers's bitterness toward petitioner and offer to assist the authorities in apprehending him; Harnage's statement to Centers that Centers could be charged with anything from a homicide to a traffic ticket; Herman's warning Centers of the gravity of his plight, and conditioning police intervention on Centers's behalf on his cooperation with the authorities; Handley's statement

to Centers (during the March 17 van conversation) that there was a possibility of probation and Centers's reply that Harnage would give them a chance; and Centers's meeting with Harnage following the March 23 van ride, reporting to him the statements made by petitioner, and inquiring what Harnage wanted Centers to do, because Centers was attempting to cooperate.

The referee further concluded that, although such information should have prompted defense counsel to undertake a complete investigation relating to possible *Massiah* error, counsel made only a perfunctory inquiry, asking Harnage a general question in a 20-second courthouse-corridor conversation. Counsel should have conducted a thorough, formal inquiry of Harnage, as well as of Wilson, questioning the deputies directly regarding the relationship Harnage had with Centers prior to the March 23 van ride, and should have obtained through discovery all information, recorded and unrecorded, relating to the interviews of Centers conducted by Harnage and other law enforcement authorities and to the decision to arrange for installation of the tape-recording device in the van.

The referee finally concluded that, based upon the information that would have been disclosed through proper investigation, defense counsel should have moved to suppress the tape recording on the ground it was procured in violation of petitioner's Sixth Amendment right to counsel as defined by *Massiah* and its progeny. Instead, counsel refrained from seeking suppression of the tape recording based upon *Massiah* error—not because of ignorance of the law, but rather because of his failure to conduct a proper investigation and to obtain critical information, relying almost entirely upon Harnage's negative answer during the brief courthouse conversation and counsel's mistaken belief that there was no *factual* basis for such a motion.

4. *Analysis.*

█  We conclude that the referee's ultimate findings and conclusions—that, while acting as a government agent, Centers deliberately elicited incriminating information from petitioner—are supported by the record in this proceeding and are consistent with governing legal principles. The record establishes that, prior to the March 23 van ride, Deputy Harnage informed Centers that the sheriff's office was seeking specific information from petitioner as to the whereabouts of the murder weapon, and that Harnage, with the assistance of Deputy Wilson, encouraged and instructed Centers as to the means by which Centers could procure this information from petitioner. Although Deputy Harnage denied having prompted Centers in this regard, the referee was entitled, as he did, to reject that testimony as not credible. Centers, in exchange for a promise (implied if not express) of some

form of leniency, based in part upon Centers's preexisting relationship with Harnage, agreed to cooperate and assist the deputies in obtaining the information sought by them. Thereafter, Wilson and District Attorney Tepper devised the ploy of providing a newspaper to petitioner and inmate Weaver, with instructions to Centers to initiate a conversation concerning its contents. By then arranging for the three codefendants to be transported together in the van, the law enforcement officials affirmatively created a situation likely to elicit incriminating statements from petitioner.

█ Although this contention was not raised in the hearing before the referee, the Attorney General now maintains that petitioner effectively "waived" his right to counsel when he spoke to Centers during the van ride, on the theory that petitioner must have been aware that Centers was an informer after reading the March 22, 1982, newspaper article, which related that Centers had provided statements to the authorities implicating petitioner as the actual shooter. In support of this theory, the Attorney General relies upon a recent federal appellate court decision, *Jenkins* v. *Leonardo* (2d Cir. 1993) 991 F.2d 1033. As we explain, we conclude that *Jenkins* does not support the Attorney General's position.

In *Jenkins*, the defendant was charged with the rape of the victim, Lacey. Prior to trial, the defendant from the jailhouse telephoned Lacey several times at her home. She refused to speak with him and reported the calls to the police. Anticipating that the defendant might call again, the authorities provided her with a tape-recording device for her telephone and instructed her to elicit statements from the defendant concerning the rape. The defendant again telephoned and in the course of the conversation made several incriminating statements. At trial, the tape-recorded statements were admitted against the defendant. Following his conviction, he sought habeas corpus relief, asserting the admission of the tape-recorded statements violated his Sixth Amendment rights under *Massiah* v. *United States*, *supra*, 377 U.S. 201 and its progeny. (*Jenkins* v. *Leonardo*, *supra*, 991 F.2d at p. 1035.)

On appeal from a judgment denying the defendant's habeas corpus petition, the Second Circuit Court of Appeals affirmed, observing that the defendant knew that the victim was cooperating with the government and would testify for the prosecution at trial, seeking his conviction. The court reasoned that, in choosing to telephone Lacey, who he knew or should have known was acting as a government agent, Jenkins must have been aware of the potential consequences of speaking to her and therefore knowingly and voluntarily waived his right to counsel. (991 F.2d at p. 1038.) The Attorney General maintains that petitioner similarly must have been aware that Centers was acting as a government agent after reading the March 22 newspaper

article. The Attorney General argues that under *Jenkins* v. *Leonardo*, *supra*, 991 F.2d 1033, petitioner knowingly waived his right to counsel when he incriminated himself during the van ride conversation with Centers.

The Attorney General's reliance upon *Jenkins* is misplaced. Far from being the victim of the crime (as was the police agent in *Jenkins*), Centers was petitioner's accomplice, facing trial on the same charges filed against petitioner. The mere circumstance that, after reading the March 22 newspaper, petitioner might have been aware that Centers had implicated him as the actual shooter, does not support the inference that petitioner must have assumed that Centers's interests were more closely aligned with those of the prosecution than with those of petitioner, or that Centers was acting on behalf of the government during the March 23, 1982, van ride. In his declaration in support of the petition, petitioner states that, at the time of the van ride, he had no knowledge Centers was acting as a police agent. Neither the record on appeal, nor the record before us in this habeas corpus proceeding, supports an inference to the contrary that petitioner must have known that Centers, in engaging him in a conversation tending to elicit incriminating remarks, was acting in cooperation with law enforcement authorities. We therefore reject the assertion that petitioner waived his right to counsel.

■ The record also supports the referee's conclusion that defense counsel's failure to investigate adequately a factual basis for the suppression of the tape recording on *Massiah* grounds, or to object to this evidence on *Massiah* grounds,[2] deprived petitioner of competent representation. ■ In order to render reasonably competent assistance, a criminal defense attorney should investigate carefully the possible grounds for seeking the suppression of incriminating evidence, explore the factual bases for defenses that may be available to the defendant, and otherwise pursue diligently those leads indicating the existence of evidence favorable to the defense. (See *People* v. *Shaw* (1984) 35 Cal.3d 535, 540 [198 Cal.Rptr. 788, 674 P.2d 759]; *In re Hall* (1981) 30 Cal.3d 408 [179 Cal.Rptr. 223, 637 P.2d 690]; *People* v. *Pope* (1979) 23 Cal.3d 412, 424, 427-428 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) In *In re Hall*, *supra*, 30 Cal.3d 408, 424-426, we held that trial counsel's failure to interview witnesses known by him to possess

---

[2]As discussed in *People* v. *Neely*, *supra*, *ante*, at page 894, footnote 8, at trial (prior to the admission of the tape recording into evidence), defense counsel sought to cross-examine Harnage regarding the nature of the relationship between Centers and the El Dorado County Sheriff's office, but failed to assert, in response to the prosecution's successful objection to this line of questioning, that inquiry as to this issue was relevant under *Massiah* and its progeny. Instead, the defense ultimately (and unsuccessfully) objected to the tape recording on hearsay grounds. As demonstrated by the evidence adduced at the evidentiary hearing in the habeas corpus proceeding, counsel did not assert *Massiah* error, because of his belief there was no factual basis for such a claim.

potentially exculpatory information, and his exclusive reliance upon information provided to him by police investigators (assertedly because he had a " 'good rapport' " with them), without hiring his own investigator, deprived his client of reasonably competent representation.

■ In the present case, the transcripts of the tape recordings of the interviews of Centers, conducted by Deputies Harnage and Wilson and Investigator Herman, in conjunction with defense counsel's knowledge of the preexisting relationship between Centers and Harnage, should have alerted competent counsel to the strong possibility that Centers was acting as a police agent during the March 23 van ride. On the basis of such information, reasonably competent counsel would have undertaken a thorough inquiry in this regard, formally examining in depth Deputies Harnage and Wilson, Investigator Herman, and possibly District Attorney Tepper, asking specific questions relating to, among other matters, (1) the circumstances surrounding the decision to tape-record the March 23 van conversation, (2) whether Centers offered to assist law enforcement authorities in procuring information from petitioner, or instead was informed that the authorities were seeking particular information, and (3) whether lenient treatment or some other benefit was offered to Centers in exchange for his cooperation.

Instead, in deciding not to pursue any further investigation relating to possible *Massiah* error, defense counsel relied upon Harnage's response to counsel's brief and informal inquiry (apparently because of counsel's high opinion of Harnage's character) and the representations made by Centers's attorney and father, both of whom presumably were acting in the best interests of Centers, and not of petitioner.

For these reasons, we conclude counsel's failure to conduct an adequate investigation and seek suppression of the March 23 tape recording of the van conversation on *Massiah* grounds constituted deficient performance.

■ Turning to the issue whether petitioner has shown the second element required in order to establish ineffective assistance of counsel— namely, prejudice—we conclude there is a reasonable probability that, had the tape recording been suppressed, the outcome with regard to the guilt phase of the trial would have been more favorable to petitioner.

The tape recording of the March 23 van conversation was the centerpiece of the prosecution's case. The prosecution presented no eyewitness or other direct evidence placing petitioner at the murder scene. In the tape recording, petitioner's own statements confirmed that petitioner was present at the scene of the crime and that petitioner, not Centers, was one of the two men

inside the residence during the commission of the crimes. In the course of the tape-recorded conversation, when Centers stated to petitioner, "I [Centers] didn't even go into the house," petitioner replied, "I know." Complaining that the authorities persisted in questioning him regarding his possible presence inside the residence, Centers said he had responded, "Hey man, I wasn't in that house." Petitioner did not contradict or challenge this version of the events.

The tape recording also established that petitioner was armed with a .22-caliber gun while inside the residence, and strongly suggested that his weapon was the murder weapon (which never was recovered). Petitioner remarked the newspapers reported the authorities still were searching for a ".22" (the murder weapon); petitioner feared that "[t]hey're going to find that fuckin' pistol," and that he "didn't bury [his weapon] or nothin'.'" When Handley inquired of petitioner, "Where your gun at," petitioner replied, "My gun is still gone." Handley then remarked, "They found mine . . . ," and petitioner replied, "Yeah." In light of the evidence establishing that the .32-caliber weapon, found buried several days following commission of the crimes, could not have been the murder weapon, the foregoing quoted colloquy established that Handley's gun was not the murder weapon.

Additionally, during the tape-recorded conversation, petitioner lamented that, with "a robbery murder, we're just deader than a mother-fucker," and warned his codefendants that "if I go," they also would "go," because they had been his accomplices—thereby strongly suggesting that petitioner not only had participated in the robbery and burglary, but was the actual perpetrator who had shot and killed the victim.

The victim's wife, Barbara Teater Chester, testified that petitioner's voice on the tape recording, which she listened to at the preliminary hearing, resembled the voice of the man whom she heard threatening her husband shortly before the shooting.

Thus, the tape recording substantially corroborated, and fortified, the other purely circumstantial evidence of petitioner's presence at the crime scene, his participation in the crimes, his possession of the murder weapon, and his identity as the actual killer.

Furthermore, during closing argument, the prosecutor relied heavily upon the incriminating nature of the tape recording, quoting repeatedly from the transcript and weaving various segments of the recorded conversation into his presentation to the jury.

Although, even without the tape recording, the evidence of petitioner's involvement in the robbery and burglary was substantial and would have

been sufficient to support a conviction of first degree murder on a felony-murder theory, we cannot assume the admission of the tape recording was not prejudicial with respect to the jury's guilty verdict on the charge of first degree murder. As noted in *People* v. *Neely, supra, ante,* at page 881, footnote 3, at Centers's trial (which occurred subsequent to petitioner's trial), the prosecution apparently was unable to establish Centers's presence inside the Chester residence, and Centers was *acquitted of murder* and convicted solely of the offenses of conspiracy to commit robbery and conspiracy to commit burglary. Moreover, at oral argument, the deputy attorney general conceded that if *Massiah* error did occur, admission of the tape recording should be found prejudicial as to the verdict of the jury finding petitioner guilty of first degree murder. We find such candor commendable, in sharp contrast to the duplicitous misconduct of the local law enforcement authorities both prior to and during the 1982 trial proceedings.

Having determined that petitioner has met his burden of establishing that defense counsel's deficient performance was prejudicial to petitioner's defense, we conclude that petitioner was deprived of the effective assistance of counsel guaranteed by the federal and state Constitutions. Accordingly, petitioner is entitled to the habeas corpus relief he seeks, namely to have the judgment set aside in its entirety. The People remain free to retry petitioner for the crimes at issue.

## DISPOSITION

The petition for writ of habeas corpus is granted. The judgment of the El Dorado County Superior Court in People v. Charles Frederick Neely, No. 40426, is vacated in its entirety. Upon finality of this opinion, the Clerk of the Supreme Court shall remit a certified copy of this opinion and order to the superior court for filing, and respondent Attorney General shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (a)(2). (*In re Sixto* (1989) 48 Cal.3d 1247, 1265 [259 Cal.Rptr. 491, 774 P.2d 164].)

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Arabian, J., and Baxter, J., concurred.

**ARABIAN, J.**—I concur in the result and analysis of the majority opinion, but write separately to discuss a provocative argument of the Attorney General, one that, however, I believe must be accepted, if at all, by the United States Supreme Court in the first instance. The argument is based primarily on the concurring opinion of Justice Powell in *Kimmelman* v. *Morrison* (1986) 477 U.S. 365, 391-398 [91 L.Ed.2d 305, 329-334, 106 S.Ct. 2574] (*Kimmelman*).

The court today sets aside the judgment because defense counsel failed to make a meritorious objection to the admission of a tape recording of a conversation among petitioner and his partners in crime. During the course of that conversation, petitioner made a number of incriminating statements. The court finds prejudice, i.e., a reasonable probability that, absent the tape recording, there would have been a result more favorable to petitioner. As both the high court and this court have repeatedly stated, "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698, 104 S.Ct. 2052] [*Strickland*]; see *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435].)

No one has suggested that the tape recording of petitioner's own words was anything but highly reliable, credible evidence. Its admission enhanced, it did not diminish, the ability of the jury to accurately determine the facts. The question is thus whether admission of such reliable evidence can ever establish prejudice under the *Strickland* standard, that is, whether our confidence in the outcome is undermined by the knowledge that the jury heard petitioner speak on tape. Justice Powell, joined by Chief Justice Burger and then-Justice Rehnquist, explored this question in *Kimmelman, supra*, 477 U.S. at pages 391-398 [91 L.Ed.2d at pages 329-334].

In that case, the majority held that a federal habeas corpus petition lies to challenge the effectiveness of defense counsel in failing to move to suppress evidence despite the general holding of *Stone* v. *Powell* (1976) 428 U.S. 465 [49 L.Ed.2d 1067, 96 S.Ct. 3037] that Fourth Amendment claims may not be brought on federal habeas corpus. Justice Powell concurred, but also discussed the "more difficult question . . . whether the admission of illegally seized but reliable evidence can ever constitute 'prejudice' under *Strickland*." (*Kimmelman, supra*, 477 U.S. at p. 391 [91 L.Ed.2d at p. 330] (conc. opn. of Powell, J.).) Justice Powell did not decide the question because it was never raised by the parties or discussed by the lower courts in the case, but he doubted that the erroneous admission of reliable evidence could ever be deemed prejudicial in the context of ineffective assistance of counsel claims.

Justice Powell noted that *Strickland* makes clear "the right to effective assistance of counsel is personal to the defendant, and is explicitly tied to the defendant's right to a fundamentally fair trial—a trial in which the determination of guilt or innocence is 'just' and 'reliable.' " (*Kimmelman, supra*, 477 U.S. at pp. 392-393 [91 L.Ed.2d at p. 331] (conc. opn. of Powell, J.).) He then argued that "the admission of illegally seized but reliable evidence does not lead to an unjust or fundamentally unfair verdict. . . . Indeed, it has

long been clear that exclusion of illegally seized but wholly reliable evidence renders verdicts *less* fair and just, because it 'deflects the truthfinding process and often frees the guilty.' [Citations.] . . . Thus, the harm suffered by respondent in this case is not the denial of a fair and reliable adjudication of his guilt, but rather the absence of a windfall. [Fn. omitted.] Because the fundamental fairness of the trial is not affected, our reasoning in *Strickland* strongly suggests that such harm does not amount to prejudicial ineffective assistance of counsel under the Sixth Amendment." (*Id.* at p. 396 [91 L.Ed.2d at p. 333], italics in original.)

Justice Powell quoted prior high court cases as "emphasiz[ing]" that the " ' ":very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote *the ultimate objective that the guilty be convicted and the innocent go free.*" ' " (*Kimmelman, supra,* 477 U.S. at p. 396 [91 L.Ed.2d at p. 333] (conc. opn. of Powell, J.), italics added by Justice Powell.) He argued that it would "shake" the right to effective assistance of counsel "loose from its constitutional moorings to hold that the Sixth Amendment protects criminal defendants against errors that merely deny those defendants a windfall. In this case, for example, the bedsheet [the evidence challenged in the case] may have provided critical evidence of respondent's guilt, evidence whose relevance and reliability cannot seriously be questioned. The admission of the bedsheet thus harmed respondent only in the sense that it helped the factfinder make a well-informed determination of respondent's guilt or innocence. In my view, nothing in *Strickland* compels us to conclude that such an 'injury' establishes prejudice for purposes of respondent's ineffective assistance claim." (*Id.* at p. 397 [91 L.Ed.2d at pp. 333-334].)

Assuming there is not also some other basis upon which the judgment should be set aside, these words apply equally to this case. Petitioner has been prejudiced only in the sense that he did not have the windfall of keeping from the jury his own voluntarily spoken admissions. Nevertheless, like Justice Powell, although for a different reason, I feel constrained from accepting this argument. A holding that prejudice has not been shown for these reasons would effectively render meaningless the majority opinion in *Kimmelman, supra,* 477 U.S. 365, and would run counter to broad language found in that opinion. (*Id.* at pp. 379-380 [91 L.Ed.2d at pp. 321-323].) Any such holding should therefore first be made by the high court. Although that court recently cited Justice Powell's concurring opinion in *Kimmelman* with apparent approval (*Lockhart* v. *Fretwell* (1993) __ U.S. __, __ [122 L.Ed.2d 180, 191, 113 S.Ct. 838, 844]), it has not yet taken that step. I therefore concur.

I do so with some reluctance, however. To the extent the doctrine of ineffective assistance of counsel is intended to enhance the factual reliability

of the determination of guilt or innocence, the outcome of this case does not do so. The tape recording of petitioner's own words made the verdict more, not less, factually reliable. Any verdict by a jury at retrial without benefit of that recording will be, although possibly more favorable to petitioner, inherently *less* reliable than the one we set aside today.