Filed 5/5/14  P. v. Sellers CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C073734 |
| Plaintiff and Respondent, | (Super. Ct. No. 62113751) |
| v. | |
| JERIMEY LEN SELLERS, | |
| Defendant and Appellant. | |

A jury convicted defendant Jerimey Len Sellers of seven counts of lewd and lascivious acts on a child under 14 (Pen. Code, § 288, subd. (a); further statutory references are to the Penal Code unless otherwise stated) and one count of lewd and lascivious acts on a child under 14 by force or fear (§ 288, subd. (b)) with multiple victims enhancement (§ 667.61, subd. (c)).  The trial court sentenced defendant to 120 years to life in state prison.

On appeal, defendant contends (1) the admission of a recorded telephone conversation from jail violated his Sixth Amendment right to counsel, (2) there is an error

1

in the abstract regarding custody credits, and (3) the imposition of a $280 restitution fine (§ 1202.4) constitutes an impermissible ex post facto punishment. We will modify the stayed parole revocation fine (§ 1202.45), order a correction to the abstract, but otherwise affirm the judgment.

FACTS AND PROCEEDINGS

### *The Crimes*

M. Sellers is the mother of three children. Her oldest child, Jane Doe One, was born in September 1997. Her youngest, Jane Doe Three, was born in December 2001.

Sellers married defendant in 2008. She lived with defendant and her three children in Rocklin. In November 2010, after Jane Doe One told her that defendant molested her, she made defendant leave their home and contacted Child Protective Services (CPS). After Jane Doe One recanted her allegation, CPS closed the case and defendant returned home.

Sellers was a close friend of L.K., the mother of Jane Doe Two, who was born in August 1998. Jane Doe Two often stayed overnight at Sellers' home. In May 2012, Jane Doe Two told L.K. that defendant had been touching her. L.K. took Jane Doe Two to the police department, where the girl made a statement. L.K. also told Sellers that defendant had touched Jane Doe Two. Sellers then talked to Jane Doe One, who said defendant had molested her and she was sorry for changing her story.

When confronted by Sellers, defendant denied touching Jane Doe Two and called her a liar. Defendant told Sellers he did nothing more than walk into Jane Doe One's room when she was naked and stood there looking at her. Sellers drove defendant to the Roseville Police Department on May 14, 2012. Defendant called the department from the parking lot, where he said that he was outside and wanted to turn himself in "for touching little girls." In a statement to a Roseville Police officer, defendant admitted molesting Jane Doe One and Jane Doe Two. He denied molesting any other minor girls.

2

On May 17, 2012, defendant was arraigned and then called Sellers from his jail cell. During the call, which was taped and played to the jury, defendant admitted molesting Jane Doe Three as well. When Sellers asked whether he put his fingers inside Jane Doe Three, defendant said, "I might of done this, but I didn't put them all inside of her. [¶] . . . [¶] I only rubbed the outside of her." Defendant also admitted kissing Jane Doe Two on the day of the Super Bowl, claiming that "she came on to me. . . . She forced herself on me, and I kissed her." Defendant also called Sellers on July 14, 2012, and said, "I'm guilty, but I'm not going to take a fucking life sentence."

Jane Doe One testified that defendant started touching her when she was 12. He would enter her bedroom, lie down, and touch her breasts and vagina. While she was sleeping in her sister's bedroom on Halloween in 2010, defendant woke her up by touching her breast and vagina with his mouth.

Jane Doe Two testified that one night while she was sleeping in Jane Doe Three's bedroom, defendant came into the room, laid down next to her, put his arms around her, and touched her breasts. Defendant also molested her when she went to the bathroom during a Super Bowl party at the Sellers' home. Defendant tried to unzip her jacket as well as trying to pull her tank top down and kiss her. He also tried to put her hands on his pants, over his penis. He left when Sellers called for him.

According to Jane Doe Three's testimony, defendant first molested her in his bedroom, when he pulled down her pants and touched her "rear-end" with his hands and with the "part" he uses to go to the bathroom. Another time he touched her rear end with his fingers.

In a recorded multidisciplinary interview center (MDIC) interview, Jane Doe Three, who called defendant "dad" even though he was not her biological father, told the interviewer, "whenever my mom was gone, my dad would take me into his room, make me bend over, he would stick his thing in my butt." This started when she was in third grade and ended when she was in the middle of the fourth grade. It happened whenever

3

her brother and sister went to the gym. Defendant made her get into bed, whereupon he pulled her pants down and started touching her. While initially he put only his fingers inside her; by the fifth time, defendant "started putting his thing in me." Defendant told her not to tell anyone because it would get him in trouble and he would hurt her.

### The Evidence Code Section 402 Hearing

Defendant moved to suppress the call he made to Sellers from his jail cell on May 17, 2012, claiming that Sellers acted as an agent of the police a violation of his Sixth Amendment right to counsel.

Rocklin Police Detective Brad Alford testified at the hearing on defendant's motion. While investigating the allegations against defendant, Detective Alford attended Jane Doe Three's MDIC interview on May 16, 2012. Following the interview, he told Sellers that he was going to jail to speak with defendant. Detective Alford then interviewed defendant in order to get him to talk about anything that happened to Jane Doe Three. Defendant invoked his right to counsel and the interview ended before he gave any information.

Detective Alford then called Sellers because she was curious about the interview. He told Sellers that defendant asked for counsel, and he could not elaborate any further as it would be improper. The detective explained to Sellers that this "was for the benefit of later prosecution."

Detective Alford also told Sellers that telephone calls coming from jail cells were recorded. He told Sellers about the recorded calls because he and Sellers "originally talked about the jail telephone calls and that being a possible option to see what--you know, if Mr. Sellers would provide any information and in regards to what he did." The first conversation about calls from jail happened on May 15, 2012, the day after defendant was taken into custody. In that first conversation, he told her if defendant called her from jail he could get copies of the calls which "could be potentially helpful for the investigation."

4

Addressing the second conversation with Sellers about calls from jail, counsel asked Detective Alford, "what else did you talk about?" Detective Alford replied: "I'm sorry. Are you talking about 5/17 after I left Placer?" Counsel said, "Sorry. I apologize. 5/17. That's correct?" Detective Alford answered, "No problem. It's confusing. There are a lot of dates. I get confused too."

The trial court interjected: "All right. Now I'm confused, because my understanding is that you went to the jail to speak with him after the MDIC interview," which was on the 16th. Detective Alford agreed. Counsel then asked Detective Alford if he called Sellers before he left the jail on May 16. Detective Alford said he pulled over at a gas station and called her from there, about 15 to 20 minutes after he interviewed defendant.

During the May 16 conversation, Detective Alford also told Sellers, "it would not be proper for me to instruct her to, you know, do these jail telephone calls. In fact, it would be a violation of his Constitutional rights." He additionally told Sellers that it would be improper for him to tell her how to make those calls as well. He was "very clear" on instructing Sellers not to make a call to jail, but if defendant "calls her and that topic comes up in conversation and he makes admissions and if you let me know later and if you choose to--if that is what you want to do, then that is something that I could obtain and it could potentially be useful." Detective Alford even explained the concept of acting as an agent to Alford and said he was "not telling [her] to do that."

Detective Alford said Sellers was crying and upset during their May 16 conversation. She asked Detective Alford if defendant made any admissions about Jane Doe Three during the interview. Although she wanted to know whether defendant had done so, Detective Alford explained, "that it just would not be proper to go into that." Sellers said she understood.

Sellers testified she remembered speaking to Detective Alford about the case after Jane Doe Three's MDIC interview. She told him that defendant kept trying "to make

5

phone calls, and I have not took any and what should I do." Detective Alford replied he could not tell her what to do because it would jeopardize the case. However, he did tell her the calls were recorded. She did not remember whether this conversation took place on May 15 or May 16. She did not remember Detective Alford telling her defendant invoked his right to counsel or that the detective could no longer talk to defendant because he asked for an attorney. She did not remember Detective Alford telling her to call him if defendant made an admission. Detective Alford did not tell her what to say or do. She just "wanted to know what happened to my babies." She was an emotional wreck at the time; that time was like a blur to her.

In a written opinion, the trial court found defendant did not establish Sellers acted as an agent for the government, and therefore denied defendant's motion.

DISCUSSION

I

*The Recorded Call*

Defendant contends admitting the recording of his May 17, 2012, call to Sellers, violated his Sixth Amendment right to counsel. We disagree.

*Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246] prohibits the use in evidence of incriminating statements made by a defendant which were deliberately elicited by a government agent in the absence of counsel after criminal proceedings have been initiated against him. The agent need not be a government employee, and the agency relationship need not be explicit or formal. Rather, it "may be 'inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct' over a period of time. [Citation.]" (*In re Neely* (1993) 6 Cal.4th 901, 915 (*Neely*).) The critical issue for purposes of *Massiah* is whether there has been a " 'knowing exploitation' of an opportunity to coax information from a formally charged suspect in the absence of his lawyer. [Citations.]" (*People v. Gonzalez*

6

(1990) 51 Cal.3d 1179, 1240.)  It is not the government's intent or overt acts that are dispositive; rather, it is the likely result of the government's acts.  (*United States v. Henry* (1980) 447 U.S. 264, 271 [65 L.Ed.2d 115, 122].)  The trial court's determination on a *Massiah* issue is essentially factual in nature and entitled to deferential review.  (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1247-1248.)

Defendant claims this case is analogous to *Neely*.  *Neely* involved a police informant for the El Dorado County Sheriff's Department, Malcolm Centers, who, along with the petitioner Neely and another person, robbed and killed a man at his home. (*Neely, supra*, 6 Cal.4th at pp. 906-907, 909.)  Within hours of his arrest for the murder, Centers told deputies that Neely was the shooter and agreed to assist the authorities in apprehending him.  (*Id.* at p. 910.)  Centers had been told that if he cooperated completely, some of the charges against him would be dismissed.  (*Ibid.*)  Neely invoked his right to silence upon his arrest and his right to counsel at his arraignment.  (*Id.* at p. 911.)  The investigating deputies told Centers they wanted to know the direction Neely fled from the home so they could better find the murder weapon.  (*Ibid.*)  They told Centers "that he (Centers) could not ask petitioner any questions *directly*, but could 'mill around them,' discuss the weapon in a 'round about way,' and 'talk about things to get him [petitioner] to talk about the crime.' "  (*Ibid.*)  A deputy provided Centers with specific examples on how to get the conversation going.  (*Ibid.*)  The prosecutor and a deputy subsequently arranged for the three codefendants to be transported together in a van in which a recording device was concealed.  (*Id.* at p. 912.)  "Thereafter, en route to court in the sheriff's van, Centers made statements likely to evoke incriminating remarks from petitioner, and petitioner in fact made such remarks regarding the crimes and the murder weapon."  (*Ibid.*)

The Supreme Court concluded "that the referee's ultimate findings and conclusions--that, while acting as a government agent, Centers deliberately elicited incriminating information from petitioner--are supported by the record in this proceeding

7

and are consistent with governing legal principles." (*Neely, supra*, 6 Cal.4th at p. 917.) It grant habeas relief for ineffective assistance of counsel based on trial counsel's failure to pursue a *Massiah* claim. (*Id.* at pp. 920, 922.)

According to defendant, this case also presents an implicit agreement, made between Sellers and Detective Alford on May 17, to obtain incriminating evidence from defendant. We are not persuaded. Unlike *Neely*, and contrary to defendant's mistaken assertion, the conversations between Detective Alford and Sellers took place before the initiation of criminal charges against defendant on May 17, 2012. Detective Alford's testimony at the Evidence Code section 402 hearing shows he talked to Sellers on May 15, the day after defendant was taken into custody, and on May 16, just after the MDIC interview. Defendant's contrary contention is based on a single statement from Detective Alford that the second interview was on May 17. This contention fails because Detective Alford almost immediately recanted this statement and affirmed that the conversation took place on May 16 after further inquiry from the trial court.

The right to counsel recognized in *Massiah* does not attach until the " ' "initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' [Citation.]" (*People v. Webb* (1993) 6 Cal.4th 494, 526.) Since any agreement between Sellers and Detective Alford necessarily happened before defendant's arraignment, defendant is asking us to find a prospective *Massiah* violation. We decline to find a violation of the Sixth Amendment right to counsel based on an agreement formed before defendant's right to counsel came into being.

Unlike the informant in *Neely*, Sellers was told not to contact defendant and was not told what information the authorities wanted from him. Also unlike *Neely*, Sellers was not told what to say to defendant if he did call her or how to obtain incriminating information from him. This case also differs from *Neely* because there is no evidence the authorities made any special arrangements for defendant to converse with Sellers. In

short, there is no evidence of an explicit or implicit arrangement between Sellers and Detective Alford to obtain information from defendant in violation of his Sixth Amendment right to counsel. Defendant's *Massiah* claim therefore fails.

## II

### *The Abstract of Judgment*

The parties identify an error in the abstract. The trial court awarded 345 days' presentence custody credit but the abstract reflects an award of 245 days. We will order a correction to the abstract.

## III

### *Restitution Fine*

Defendant contends the imposition of a $280 restitution fine (§ 1202.4, subd. (b)) violates the prohibition against ex post facto laws.

At the time of defendant's crimes, the minimum restitution fine was $200. Effective January 1, 2012, the minimum was raised to $240. Effective January 1, 2013, the minimum was raised again to $280. (§ 1202.4, subd. (b)(1).) Defendant was sentenced on April 24, 2013. According to defendant, the trial court intended to impose the minimum fine, which was $200 rather than the $280 actually imposed. He concludes imposing the higher minimum fine was an ex post facto violation and the fine should be reduced to $200.

Pronouncing judgment, the trial court imposed "a $250 state restitution fine" and "an additional $280 restitution fine pending revocation of parole." The probation report recommended a $4,000 restitution fine and a stayed $4,000 parole revocation fine. The abstract and minute order imposed a $280 restitution fine and a stayed parole revocation fine for the same amount.

"In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation

9

restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (§ 1202.45, subd. (a).)

Since the trial court imposed a $250 restitution fine, we shall modify the parole revocation fine to $250. As the $250 amount does not conform to any statutory minimum, it is clear that the trial court did not intend to impose the minimum fine. Defendant's ex post facto contention is therefore without merit.

DISPOSITION

The judgment is modified to impose a stayed parole revocation fine (§ 1202.45) of $250. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting $250 restitution (§ 1202.4) and stayed parole revocation fines, as well as an award of 345 days' custody credit. The trial court is further directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

                                               HULL            , J.


We concur:


        BLEASE          , Acting P. J.


        DUARTE          , J.


10